Anthony COLIN, By and Through his mother and guardian, Jessie COLIN; Heather Zetin, by and through her mother and guardian, Judy Anderson; and Gay–Straight Alliance Club of El Modena High School, an unincorporated association, Plaintiffs,

v.

ORANGE UNIFIED SCHOOL DISTRICT; Orange Unified School District Board of Education; Linda Davis, in her official capacity as President of the Orange Unified School District Board of Education; Martin Jacobson, in his official capacity as Vice President of the Orange Unified School District Board of Education; Kathy Ward, in her official capacity as Member and Clerk of the Orange Unified School District Board of Education; and Maureen Aschoff, William Lewis, Terri Sargeant, and Robert Viviano, in their official capacities as Members of the Orange Unified School District Board of Education;

---

Barbara Van Otterloo, in her official capacity as Superintendent of the Orange Unified School District; and Nancy Murray, in her official capacity as Principal of El Modena High School, Defendants.

No. SACV99–1461DOC(ANx).

United States District Court,
C.D. California.

Feb. 4, 2000.

Bruce A. Wessel, Andra Barmash Greene, Elliot N. Brown, Robert N. Klieger, Laura W. Brill, David C. Codell, Irell & Manella, Los Angeles, CA, Jon W. Davidson, Myron Dean Quon, Lambda Lega Defense & Education Fund, Los Angeles, CA, Judith Schaeffer, Elliot M. Mincberg, People for the American Way Foundation Legal Dept., Washington, DC, for plaintiffs.

James A. Bowles, E. Sean McLoughlin, Hill Farrer & Burrill, Los Angeles, CA, for defendants.

## *ORDER*

CARTER, District Judge.

Before the Court is Plaintiffs' Motion for Preliminary Injunction. Plaintiffs are students who wish to form a "Gay–Straight Alliance Club" at their high school. They claim that Defendants, the Orange Unified School District and its Board of Education and administrators, have violated their rights under the Equal Access Act and their First Amendment rights of expression and association when they voted to deny Plaintiffs' application to form the club. At issue is whether Plaintiffs are

likely to prevail on these claims and whether an injunction should issue prohibiting Defendants, while this action is pending, from continuing to deny Plaintiffs the same access to El Modena facilities that is accorded to other student groups.

## I. Statement of the Facts

There are limited factual disputes in this case. The parties have stipulated to the authenticity of all exhibits submitted, except for newspaper articles. Out of an abundance of caution, the Court heard testimony at the preliminary injunction hearing in order to address some of the limited factual disputes.

In late August 1999, Anthony Colin ("Colin") and his friend Shannon MacMillan ("MacMillan") decided to form a "Gay–Straight Alliance Club" ("GSA") at their school, El Modena High School in Orange, California. Colin, a tenth-grade student, had the idea after Matthew Shepherd, a young man from Wyoming, died after being brutally assaulted due to his homosexuality. Colin testified that he wanted to form the club to promote acceptance among and for gay and straight students at the school. After discussing the idea with friends and family, Colin submitted a club constitution in compliance with school policy during the week of September 7, 1999, the first week of the school year. The application stated that the purpose of the club was "to promote interest in a supportive community amongst our peers." Colin Decl., Ex. B.

Shortly thereafter, Colin submitted a mission statement for the club that had been written by MacMillan, a twelfth grade student. The group's mission statement is:

Public schools have an obligation to provide an equal opportunity for all students to receive an education in a safe, nonhostile, nondiscriminatory environment. Our goal in this organization is to raise public awareness and promote tolerance by providing a safe forum for discussion of issues related to sexual orientation and homophobia. We wish

to stress the need for people to put aside their personal prejudice and agree to treat everyone with respect when the situation calls for it. We invite ALL students, gay or straight, to join us in discussions, field trips, lectures, and social activities that will counterattack unfair treatment and prejudice. We respect privacy and require NO one to make disclosures regarding his or her own sexual orientation.

This is not a sexual issue, it is about gaining support and promoting tolerance and respect for all students.

Colin Decl., Ex. C. Colin asked Mrs. Maryina Herde, a drama and English teacher at the school, to serve as the faculty advisor and she accepted. The application was turned in to the teacher in charge of student activities at the high school, who passed the application on to the Principal, Nancy Murray.

Colin and the other founders of the Gay–Straight Alliance had reason to believe that their application would be accepted. Consistent with the policy of the Orange Unified School District's Board of Education ("the Board"), their high school had a policy of allowing student-initiated groups to meet on school grounds during lunch period and to use school facilities to publicize their meetings and activities. A recent list of the clubs on campus, of which there are 38 in total, includes the following noncurriculum related student groups: the Asian Club, Black Student Union, Christian Club, Gentlemen's Club, Girls' League, Koinonia (for Catholic students), MECHA (Movimiento Estudiantil Chicano de Aztlán), and Red Cross/Key Club. *See* Colin Decl., Ex. D. Plaintiff's application was not approved, however. Principal Murray had been instructed by Assistant Superintendent Neil McKinnon ("McKinnon") in the Spring of 1998 to keep him informed of the formation of any gay-straight alliance-type group. She was told the Board may want to make a decision on the application, contrary to its custom of leaving the decision to the administration,

because the Board may not approve it. Principal Murray therefore forwarded the policy to the Assistant Superintendent. McKinnon gave the application to the Superintendent, Barbara Van Otterloo, who then forwarded it to the Board.

Because the Board had not yet acted on their application, Plaintiffs asked Principal Murray to participate in "Club Rush," a one day informational fair about student groups, during the first week of October 1999. It was only after they asked to participate in the club fair that Principal Murray informed Colin that the group's application had been passed on to the Board and the group would not be permitted to participate in "Club Rush." As Plaintiffs' mission statement was being scrutinized by the Board, all the other clubs displayed their banners and distributed their mission statements at "Club Rush." Though there was no Gay–Straight Alliance table at the event, approximately 58 students signed a petition in support of the GSA. At the end of Club Rush, on October 7, 1999, the Board decided to delay action on Plaintiff's application and voted to have a public forum on whether the Gay–Straight Alliance should be permitted. Weeks before the public forum, Principal Murray informed Colin that the name of his club was inappropriate and suggested alternate names such as the "Tolerance Club," the "Acceptance Club," or the "Alliance." *See* Colin Decl., ¶ 12. No other club at El Modena has been approached by the Principal or the Board with suggestions to change the name that they chose for their club. By the end of October, a representative of the Gay Lesbian Straight Education Network of Orange County ("GLSEN"), a volunteer group that tries to end anti-gay bias in schools, contacted Herde and the Plaintiffs after learning of their struggle due to the publicity it had generated. "Gay–Straight Alliance" is a name recommended for clubs by the national GLSEN. Since October, Luis Torres, the co-chair of the Orange County chapter of GLSEN, has had three meetings with students interested in the GSA

as a means of providing them with moral support.

On November 9, 1999, the Board held the public forum. After hearing arguments both for and against the GSA, the Board decided to postpone the vote until November 18, 1999. At the November 18, 1999 meeting, Defendant Board Member Bill Lewis said, "The Bible says we're all sinners, but this, in my opinion, is asking us to legitimize sin." Codell Decl., Ex. A. Board Member Linda Davis said, "We know the law is on their side, but our community members don't want it." *Id.* Plaintiff Heather Zetin, an eleventh grade member of the student group, explained to the Board that she believed in sexual abstinence and again assured the Board that the GSA would not discuss sex. Still, the Board postponed its decision for a third time. After three months of delays, Colin, Zetin and the GSA filed this action. Although there are about six hundred gay-straight alliance clubs at high schools across the country, this is reportedly only the fourth lawsuit against school districts by students seeking to form such clubs. *See* Kate Folmar and Marissa Espino, *Orange Unified Trustees Deny Gay Club, 7–0*, L.A. Times, Dec. 8, 1999 at A10.

On December 7, 1999, the Board unanimously, seven to zero, approved a motion by Defendant Kathy Ward to deny Plaintiffs' application to form the Gay–Straight Alliance Club. The Board objected to the appropriateness of what they claimed was a sexually charged club. The decision was publicly announced as opponents of the club stood by with pickets, some of which stated, "GRADES NOT AIDS." John Ritter, *Gay Students Stake Their Ground*, USA Today, Jan. 18, 2000 at 2A; Ann Pepper, *District Rejects Gay School Club*, Orange Co. Register, Dec. 8, 1999 at A1 (picture). Ward's motion was grounded on the following four reasons:

(1) the proposed GSA has a subject matter related to sexual conduct and sexuality; (2) the District and El Modena High School offer courses that

address sex, sexual conduct, sexual abstinence, and sexual transmission of diseases; (3) the State of California in the Education Code imposes strict requirements on how, when and by whom sex education and related courses are taught; and (4) the Board should consider that unrestricted, unsupervised student led discussion of sexual topics is age inappropriate and is likely to interfere with the legitimate educational concerns of the District in this sensitive area of sex education.

Codell Decl., Ex. E. The Board further stated that it would not foreclose the submission of a revised mission statement "for a tolerance club with an appropriate name and a mission statement that clearly states that sex, sexuality, [and] sex education ... will not be the subject of discussion in club meetings." *Id.*

On December 16, 1999, at 9:40 a.m., Superintendent Van Otterloo and Principal Murray pulled some of the students interested in the GSA, including Colin and Zetin, out of their classes to discuss this matter. Although Principal Murray believes that there is value in a club that allows harassed students to discuss issues of homophobia and would have approved the club if it were her decision, she edited the group's name and MacMillan's Mission Statement in a way that might meet the Board's concerns. She proposed a "Draft" that deleted any references to "gay," "straight" or "sexual orientation." Her changes included crossing out the name of the club and replacing it with "Tolerance For All," and deleting "sexual orientation and homophobia" and replacing it with "intolerance in all of its forms." Finally, Murray added a statement that "sex, sexuality, [and] sex education" will not be discussed at the meetings. Colin testified under oath that Principal Murray was "tearing my rights down" when she made these edits. Similarly, Zetin testified that adding the language from the Education Code "would communicate that gay people are inherently more sexual or sexually promiscuous when they're just people."

The dialogue between Plaintiffs and Defendants broke down after the December 16, 1999 meeting. To date, Colin, Zetin and 12 to 15 other students interested in the GSA have had five informal meetings across the street from the school. Colin and Zetin testified that because close to 60 students have expressed interest in the club, their efforts have been significantly frustrated by their inability to post flyers, make announcements on the public address system or meet on campus like other official clubs.

## II. Analysis

This Court has jurisdiction under 28 U.S.C. § 1331, for actions arising under the Constitution and laws of the United States, as Plaintiffs allege violations of the Equal Access Act, 20 U.S.C. §§ 4071–4074, the Civil Rights Act of 1871, 42 U.S.C. § 1983, and the Fourteenth Amendment to the United States Constitution. Plaintiffs seek declaratory relief under 28 U.S.C. §§ 2201–2202.

### A. The Equal Access Act

Plaintiffs are suing under a federal law, the Equal Access Act. An understanding of how the law came into being is helpful in order to understand its operation and whether or nor it has been violated.

The Equal Access Act was passed to fit within the Constitutional limits that the Court has placed on school control over student speech. Some discussion of the First Amendment is therefore necessary to explain the somewhat surprising notion of federal courts requiring local school officials to recognize a student group that they did not choose to recognize. In general, "the education of the Nation's youth is primarily the responsibility of parents, teachers, and state and local school officials, and not of federal judges." *Hazelwood School Dist. v. Kuhlmeier*, 484 U.S. 260, 273, 108 S.Ct. 562, 571, 98 L.Ed.2d 592 (1988). The "daily operation of school systems" is traditionally reserved to the States and their local school boards. *Ep-*

*person v. Arkansas,* 393 U.S. 97, 104, 89 S.Ct. 266, 270, 21 L.Ed.2d 228 (1968) (striking down state law that prevented teaching the theory of evolution in public schools). Federal courts do intervene, however, when decisions of local school boards run afoul of the Constitution. *See, e.g., Brown v. Board of Education,* 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954). In *West Virginia Board of Education v. Barnette,* for example, the Supreme Court found that a public school may not compel a student to salute the flag. *See* 319 U.S. 624, 63 S.Ct. 1178, 87 L.Ed. 1628 (1943).

Public school students do not "shed their constitutional rights to freedom of speech or expression at the schoolhouse gate." *Tinker v. Des Moines Independent Community School Dist.,* 393 U.S. 503, 511, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969). Students do not, however, have all the First Amendment rights of adults in other settings because their rights must be "applied in light of the special characteristics of the school environment." *Id.* at 506, 89 S.Ct. 733. In *Tinker,* students were suspended until they removed their armbands protesting the Vietnam War. The Court found that school censorship of student expression was unconstitutional unless the speech "materially disrupts classwork or involves substantial disorder or invasion of the rights of others." *Id.* at 513, 89 S.Ct. 733. The "material disruption" standard is very similar to the one adopted by Congress in the Equal Access Act. Though school officials in *Tinker* may have disapproved of the war protesters' beliefs, official suppression of student speech in high schools could not be justified by the "mere desire to avoid the discomfort and unpleasantness that always accompany an unpopular viewpoint." *Id.* at 509, 89 S.Ct. 733.

The reason for the First Amendment's ban on official censorship is because in a free society we rely on the "marketplace of ideas." *See Abrams v. United States,* 250 U.S. 616, 630, 40 S.Ct. 17, 63 L.Ed. 1173 (1919) (Holmes, J., dissenting). Though the state education system has the awesome responsibility of inculcating moral and political values, that does not permit educators to act as "thought police" inhibiting all discussion that is not approved by, and in accord with the official position of, the state. The danger is that public education could transform schools into "enclaves of totalitarianism" and convert students into "closed-circuit recipients of only that which the State chooses to communicate." *Tinker,* 393 U.S. at 511, 89 S.Ct. 733. Though it may educate many of Orange's students, the Orange Unified School District must not become an Orwellian "guardianship of the public mind," *Thomas v. Collins,* 323 U.S. 516, 545, 65 S.Ct. 315, 89 L.Ed. 430 (1945) (Jackson, J., concurring), that can "strangle the free mind at its source." *Barnette,* 319 U.S. at 637, 63 S.Ct. 1178.

The only way to maintain the "independence and vigor of Americans who grow up here" is through tolerating speech that school authorities may vehemently disagree with. *Tinker,* 393 U.S. at 509, 89 S.Ct. 733. "[O]ur history says that it is this sort of hazardous freedom—this kind of openness—that is the basis of our national strength." *Id.* at 508–9, 89 S.Ct. 733. The democratic response to speech that people disagree with is more speech: by allowing students to express both the popular and unpopular viewpoints society can foster "enlightened opinion." *Cantwell v. Connecticut,* 310 U.S. 296, 310, 60 S.Ct. 900, 84 L.Ed. 1213 (1940). "[S]econdary school students are mature enough and are likely to understand that a school does not endorse or support student speech that it merely permits on a nondiscriminatory basis." *Board of Education of the Westside Community Schools v. Mergens,* 496 U.S. 226, 250, 110 S.Ct. 2356, 110 L.Ed.2d 191 (1990).

The Supreme Court found in 1981 that when state universities make their facilities generally available for use by registered student groups, they could not single out religious groups and prevent them from meeting. *See Widmar v. Vincent,* 454 U.S. 263, 102 S.Ct. 269, 70 L.Ed.2d 440 (1981). Though the presence of religious

groups raised concerns about possibly violating the separation of church and state, the Court found that the religious speech and association rights of a Christian group at the University of Missouri at Kansas City were protected by the First Amendment. The *only* reason that the idea of religious groups using public facilities did not violate the Establishment Clause of the First Amendment (which provides that "Congress shall make no law respecting an establishment of religion") was because under an "equal access" policy, a school is not endorsing any particular viewpoint, either for or against religion in general or for or against any particular religion. *See id.* at 270–76, 102 S.Ct. 269. The Court did not decide in that case if high schools with an "equal access" policy, as well as universities, were prevented from excluding certain student groups on the basis of the content of their speech. *See id.* at 274 n. 14, 102 S.Ct. 269.

In the 1984 Equal Access Act, Congress extended the rule in *Widmar* to public high schools. Under the Act, schools that allow student groups whose purpose is not directly related to the curriculum to meet on school grounds during lunch or after school cannot deny other student groups access to the school due to the content of the students' proposed discussions. *See* 20 U.S.C. § 4071(a), (b). In the words of the Act:

> It shall be unlawful for any public secondary school which receives Federal financial assistance and which has a limited open forum to deny equal access or a fair opportunity to, or discriminate against, any students who wish to conduct a meeting within that limited open forum on the basis of the religious, political, philosophical, or other content of the speech at such meetings.

20 U.S.C. § 4071(a). The Act was intended to counteract perceived discrimination against religious speech in public schools and overturn two appellate court decisions that had held that allowing student religious groups to meet on campus before and after classes would violate the Establishment Clause. *See Mergens,* 496 U.S. at 239, 110 S.Ct. 2356. The Act was "passed by wide, bipartisan majorities in both the House and the Senate." *Id.* at 239, 110 S.Ct. 2356. As in the *Widmar* case, allowing religious groups on campus was constitutional only because an "equal access" policy does not endorse any particular viewpoint, does not give direct benefits to religion to such a degree that it tends to establish a state religion, or coerce students to participate in a religious activity. *See id.* at 247–253, 110 S.Ct. 2356 (plurality holding regarding endorsement) (O'Connor, J.); *id.* at 258–62, 110 S.Ct. 2356 (concurring opinion regarding establishing a state religion or coercing students) (Kennedy, J.). The constitutionality of the law therefore hinged on its openness and neutrality: if a school that accepts federal funds allows some "noncurricular" student groups, it can not deny others "on the basis of the religious, political, philosophical, or other content of the speech" at the student meetings. 20 U.S.C. § 4071(a).

When Congress passed the Equal Access Act, it "made a matter once left to the discretion of local school officials the subject of comprehensive regulation by federal law." *Mergens,* 496 U.S. at 259, 110 S.Ct. 2356 (Kennedy, J., concurring). As Justice Kennedy pointed out, "one of the consequences of the statute, as we now interpret it, is that clubs of a most controversial character might have access to the student life of high schools that in the past have given official recognition only to clubs of a more conventional kind." *Id.* It's true that when courts enforce the Act, they remove control from local school boards; "(t)his decision, however, was for Congress to make, subject to constitutional limitations." *Id.* Due to the First Amendment, Congress passed an "Equal Access Act" when it wanted to permit religious speech on school campuses. It did not pass a "Religious Speech Access Act" or an "Access for All Students Except Gay Students Act" because to do so would be unconstitutional.

It is against the backdrop of this federal law that this Court must decide whether the locally elected Orange Unified School District Board of Education can vote to deny recognition by the school to one club out of many that have sought to meet on campus.

## B. Preliminary Injunction Standard

■ Plaintiffs have the burden of showing that they are entitled to preliminary relief. The "traditional test" requires that Plaintiffs demonstrate 1) a strong likelihood of success on the merits; 2) a significant threat of irreparable injury; 3) greater hardship to Plaintiffs than Defendants; and 4) that the public interest favors granting the injunction. *See American Motorcyclist Ass'n v. Watt*, 714 F.2d 962, 965 (9th Cir.1983).

## C. Plaintiffs Have a Strong Likelihood of Succeeding on the Merits of their Claim for Violation of the Equal Access Act

In order for Plaintiffs to show a likely violation of the Equal Access Act, they must show that El Modena High School accepts federal funds, has a "limited open forum," and has discriminated against students wishing to conduct a meeting within the open forum due to the content of speech that will take place at the proposed meetings. *See* 20 U.S.C. § 4071(a). It is undisputed that the Board accepts federal funding.

### 1. The Board has Established a "Limited Open Forum" at El Modena High

■ A school has a "limited open forum" whenever it "grants an offering to or opportunity for one or more noncurriculum related student groups to meet on school premises during noninstructional time." 20 U.S.C. § 4071(b). "Even if a school allows only one 'noncurriculum related student group' to meet, the Act's obligations are triggered and the school may not deny other clubs, on the basis of the content of their speech, equal access to meet on school premises during noninstructional

time." *Mergens*, 496 U.S. at 236, 110 S.Ct. 2356.

■ Many schools encourage the growth of a "limited open forum," recognizing that clubs "participate in the intellectual give and take of campus debate . . ." *Healy v. James*, 408 U.S. 169, 181, 92 S.Ct. 2338, 2346, 33 L.Ed.2d 266 (1972). Indeed, the El Modena Board "believes that curriculum- and non-curriculum-related student organizations have an important place in students' lives . . . [and] enhance school spirit and students' sense of belonging." BP 6145.5(a). Recognizing the value of student groups on a high school campus, the Orange Unified Board has provided for a "limited open forum" in both word and deed. The Board's written policy states that it has a "limited open forum in accordance with provisions of the federal Equal Access Act" because the district allows student groups "not directly tied to the curriculum." BP 6145(a). The Board's policies track the language of the Equal Access Act. *See* BP 6145(a), (b). Whether or not a school has a "limited open forum" is determined by looking at "a school's actual practice rather than its stated policy." *Mergens*, 496 U.S. at 246, 110 S.Ct. 2356. Like its policy, El Modena's actual practice is that of a "limited open forum," as it recognizes many noncurriculum clubs including the Asian Club, Black Student Union, Chess Club, Christian Club, Earth Club, Eighties Club, Girls' League, Koinonia (for Catholic students), Juggling Club, Mountain Bike Club, Red Cross/Key Club, and Ski Club. *See* Colin Decl., Ex. D. El Modena has created a "limited open forum" and is therefore precluded from discriminating against student groups seeking access to that open forum.

### 2. The Gay–Straight Alliance is a "Noncurriculum Related Student Group"

■ Defendants contend that the Gay–Straight Alliance is not protected by the Act because it is related to the curriculum.

**1144**

Specifically, Board Member Kathy Ward stated in her motion that "the District has a curriculum on sex education, which deals with human sexuality, sexual behavior and consequences, and prevention of sexually transmitted diseases. To the extent that the proposed GSA club intends to discuss these issues related to sexual orientation, the club is a 'curriculum related' club, not covered by the Equal Access Act." Codell Decl., Ex. E. The District contends that these subjects are taught in the following classes: Health (which is required for all ninth grade students); Biology and Life Sciences (students are required to take one of the two to graduate); and Family Planning (which is an elective). The District has specific guidelines for instruction on family life, sex education, and AIDS prevention. *See* BP 6142.1; 6142.1(a), (b); 6142.2(a), (b). The topics covered in the Sex Education curriculum include "physiology of the reproductive system; conception through birth; prevention of pregnancy and sexually transmitted diseases; the benefits of abstinence, including it being the only totally effective prevention method; issues related to dating, marriage and parenting; and sexual assault and prevention." AR 6142.1.

According to Colin, Zetin, and the Mission Statement of the Gay–Straight Alliance, however, they do not intend to discuss topics that are covered under the sex education curriculum. According to the Mission Statement, their goal was to talk about "tolerance," "issues related to sexual orientation and homophobia," the need to "treat everyone with respect," and counterattacking "unfair treatment and prejudice." Colin Decl., Ex. C. The Mission Statement emphasizes, in a one-sentence paragraph at the end, that "[t]his is not a sexual issue, it is about gaining support and promoting tolerance and respect for all students." *Id.* Both Colin and Zetin state in their declarations that the club did not propose to talk about the things that were covered in sex education. Furthermore, none of the classes at El Modena covered discrimination and harassment based on sexual orientation. Zetin testi-

fied that "the word homosexual is never even mentioned in our classes." Colin testified that the club was about "acceptance" for gay and straight people, and about helping people deal with being called "fag" or "dyke." Both Colin and Zetin laughed on the stand at the thought of the group discussing the "physiology of the reproductive system" and the other issues covered in Health class. What the students *did* want to talk about is best expressed in their own words. Echoing the Mission Statement, Zetin testified "I want us to talk about the experiences that gay, lesbian and bisexual kids go through in their everyday lives such as harassment, coming out of the closet or telling people that they are gay: the fear and the emotions such as self-hatred or denial that a lot of kids go through and the harassment they get and how to deal with that."

In order to establish that issues regarding homophobia were discussed in the curriculum, the Defendants introduced into evidence a Teacher's Edition of a *Human Sexuality* textbook. Principal Murray testified that part of the book was used by some teachers in the required Health class. Under cross-examination, however, Murray admitted that she was not sure if the section on homophobia in that book was given to students. She also did not think that other sections in the book had ever been given to students. Plaintiffs' counsel pointed out the ridiculousness of the notion that everything in the book was taught in Health class, as the book included sections on "sadism," "sado-masochism," "fetishism," "transvestitism," "obscene phone calls," "exhibitionism," and "pedophilia." These subjects would hardly be offered as a normal part of any secondary school curriculum. Plaintiffs amply demonstrated that the fact that El Modena had the Teacher's Edition of this book on a shelf in its media center did not mean that the subjects were necessarily taught in class. After reviewing the evidence submitted during the briefing and listening to testimony at the preliminary injunction hearing, the Court finds as a matter of fact

that the subject matter of the proposed Gay–Straight Alliance was not covered in the curriculum at El Modena High School.

Even if there were some overlap between what the students wanted to talk about and a subject covered in the curriculum at El Modena, a greater nexus is required or else the club is still considered "noncurriculum related" under the Equal Access Act. Congress did not define the phrase "noncurriculum related" in the Act. It did define the "meetings" that must be accommodated under the Act as activities of student groups that are "not directly related to the school curriculum." 20 U.S.C. § 4072(3). This "implies that student groups directly related to the subject matter of courses offered by the school do not fall within the 'noncurriculum related' category." *Mergens*, 496 U.S. at 237, 110 S.Ct. 2356. The Supreme Court found that this made sense in light of the Act's purpose: "Because the purpose of granting equal access is to prohibit discrimination between religious or political clubs on the one hand and other noncurriculum-related student groups on the other, the Act is premised on the notion that a religious or political club is itself likely to be a noncurriculum-related student group." *Id.* at 238, 110 S.Ct. 2356. A curriculum-related student group is "one that has more than just a tangential or attenuated relationship to courses offered by the school" and "must at least have a more direct relationship to the curriculum than a religious or political club would have." *Id.* Thus, if a Christian Club prays for abstinence, it is still "noncurriculum related" even though abstinence is a topic covered in the curriculum. Indeed, Zetin testified that she believed in abstinence. Just as with the Christian Club, if discussion of abstinence were to arise at one of the meetings of the Gay–Straight Alliance, the club would still be "noncurriculum related."

■ The Supreme Court found that the term "is best interpreted broadly to mean any student group that does not directly relate to the body of courses offered by the school." *Mergens*, 496 U.S. at 239, 110 S.Ct. 2356. The Court defined four ways in which a student group "directly relates to a school's curriculum:"

[1.] if the subject matter of the group is actually taught, or will soon be taught, in a regularly offered course; [2.] if the subject matter of the group concerns the body of courses as a whole; [3.] if participation in the group is required for a particular course; or [4.] if participation in the group results in academic credit.

*Id.* at 239–40, 110 S.Ct. 2356. According to the Court, "this limited definition" was "consistent with Congress' intent to provide a low threshold for triggering the Act's requirements." *Id.* at 240, 110 S.Ct. 2356. As stated earlier, the Court finds as a matter of fact that there is no overlap between the curriculum and the GSA's proposed discussions. It takes a significant leap of the imagination to believe that the same board that voted unanimously against permitting this group on campus has also included the subject matter of what Plaintiffs intend to discuss in the curriculum. But even if there were some small nexus between what is taught in some classes and what the group proposes to discuss, it would require considerably more for the Gay–Straight Alliance to be considered curriculum related under *Mergens*. The subject matter of the group, dealing with their personal experiences of homophobia and seeking to improve relations among and between gay and straight students, is not "actually taught … in a regularly offered course" at El Modena. *Id.* at 239, 110 S.Ct. 2356.

■ Finally, even if the Court were to find at trial that the subject matter of the Gay–Straight Alliance was actually taught in a regularly offered course at El Modena, the Equal Access Act does not then allow the Board to withhold official recognition of the group. Whether or not a school recognizes a "noncurriculum related student group" merely determines whether or not the Act's obligations are triggered. Once a school recognizes any such

group, it has created a "limited open forum" and the school is prohibited "from denying equal access to *any* other student group on the basis of the content of that group's speech." *Id.* at 240, 110 S.Ct. 2356 (emphasis added). Contrary to the Board's interpretation of the Act, the Board may not foreclose access to the "limited open forum" merely by labeling a group curriculum-related. The only meetings that schools subject to the Act can prohibit are those that would "materially and substantially interfere with the orderly conduct of educational activities within the school." 20 U.S.C. § 4071(c)(4). So long as the Board has a "limited open forum" at El Modena and allows any "non-curriculum related" student groups to meet, it can not prohibit the Gay–Straight Alliance even if its meetings directly relate to the curriculum. Instead, the Board will have to show that meetings will "materially and substantially interfere with the orderly" instruction of students. The Board will not likely be able to show that groups of students discussing homophobia and acceptance of all students regardless of sexual orientation somehow serves as a major disruption to the education of students. Indeed, this club is actually being formed to avoid the disruptions to education that can take place when students are harassed based on sexual orientation.

### 3. The Gay–Straight Alliance is Not Controlled by Nonschool Persons

■ The Equal Access Act provides a "safe harbor" provision that requires schools to offer a "fair opportunity" to meet in several ways. Schools must provide that (1) "the meeting is voluntary and student-initiated;" (2) the school does not sponsor the meeting; (3) school officials do not participate in any religious meetings; (4) the meeting does not "substantially and materially interfere" with educational activities; and (5) "nonschool persons may not direct, conduct, control, or regularly attend activities of student groups." 20 U.S.C. § 4071(c). Defendants denied the proposed club in part because the students insisted on the title "Gay Straight Alli-

ance" which Defendants claim is recommended by GLSEN. According to Board Member Ward, "The use of the name suggests that this club is being directed and controlled to some extent by nonschool persons." Ward Decl., Ex. 1.

According to the testimony at the preliminary injunction hearing, however, Colin generated the idea for the club himself, only discussing it with family and friends. Zetin agreed in her testimony that the group was entirely student-initiated. Colin was contacted by GLSEN only after the Board had delayed for several months after receiving the application. Luis Torres, a co-chair of the Orange County chapter of GLSEN, testified that he wanted to provide "moral and emotional support" to their effort and inform Colin of his legal rights. Before mid-October, when the group was already being reviewed by the Board, Colin had not had any contact with GLSEN. The testimony of Colin, Zetin, and Torres was consistent that after Torres contacted Colin, his help was limited to providing emotional support to the students in their struggle to form a GSA. GLSEN in no way intended to "conduct," "control," or even "attend" GSA meetings. The Court finds as a matter of fact that outside organizations had no role in the GSA application to form a student group and that nonschool persons never planned to direct GSA meetings.

In addition, the Board would have to allege far more involvement from an outside organization to justify denying a student group on the basis of Section 4071(c)(5); using a name that is similar to names of other student groups, and which is the name suggested by the national GLSEN, would not approach the level of control necessary to exempt a student group from the Act's protections. Furthermore, the Board would have to impose any restrictions regarding "nonschool persons" "uniformly" under the Act's "safe harbor" provision. 20 U.S.C. § 4071(c). The Board clearly has not done so since it permits the names MECHA and Red

Cross/Key Club. These names suggest affiliation with national organizations and the clubs are in fact associated with, though not controlled by, nonschool persons. Considering all the evidence submitted and the testimony taken at the hearing, the Court also finds as a matter of fact that the Board's contention that the group's use of the word "straight" is "divisive" and "derogatory" is not credible and merely pretextual.

### 4. The Gay–Straight Alliance has been Denied Access to the "Limited Open Forum" and the Accompanying Benefits of Being a School–Recognized Club

■ Because the Board has created a "limited open forum," it must give Plaintiffs all the same rights and privileges that it gives to other student groups. Once recognized, student groups are permitted to meet on campus during noninstructional time, publicize the group at "Club Rush," post flyers, make announcements over the public address system, and have a group picture in the yearbook. Defendants argue that Plaintiffs' First Amendment rights have not been harmed or abridged because they can still meet informally. Defendants claim that being denied official recognition by the school and the privileges that flow from recognition does not constitute First Amendment harm. Instead, Defendants contend no "limited open forum" has been created with respect to the benefits of recognized club status because the Defendants control the "time, place, manner, and *content* of expressive activities using these privileges, to the extent allowed by the Equal Access Act and all other applicable laws." Defs.' Opp. 18 n. 4 (emphasis in original). This is exactly the type of content-based restriction that is forbidden by the Equal Access Act. To the extent that the Board opens up its school facilities to *any* noncurriculum related group, it must uniformly open its facilities to *all* student groups. *See Ceniceros v. Board of Trustees of the San Diego Unified School District*, 106 F.3d 878 (9th Cir.1997) (finding that allowing a religious club to meet before and after school but not during lunchtime was not sufficient to satisfy the Equal Access Act when other student groups were allowed to meet during lunchtime).

■ The Board also argues that the application has only been conditionally denied. According to the statement of Kathy Ward at the Board Meeting voting down the club's application, the student group could be approved if (1) they agreed not to discuss sex education topics covered under the California Education Code; and (2) their club was renamed with a different title that was less "divisive" and less likely to be perceived as "derogatory" or affiliated with an outside adult organization. As detailed above, the Board's objections in regard to the outside adult organization are not factually justified or valid under the Act. The Board's allegedly "modest" proposal to require the group to change its name is also not permissible.

A group's speech and association rights are implicated in the name that it chooses for itself. The Board is not allowed to require the student group to change its name merely because the Board finds that it would be less "divisive." The Board's suggested alternatives include the "Tolerance Club" and "Tolerance for All." Zetin and Colin testified that these name changes would attack the very core reason for having the club. Colin said that if he had to change the name, he "would feel my constitutional rights are useless." With the revised name change, Colin felt the emphasis of the club would not be on counteracting homophobia, the core mission of the group. He said that the use of the word "Gay" in the title is important to announce that "being gay or homosexual is not bad, it's who you are." Zetin testified that the Board's proposed revisions "take the whole purpose of the club and change it." She said that taking the word gay out would take the focus away from the issues people face and would imply that there's something wrong with the word "gay." In addition, Colin does not even like the word

"tolerance" because it is not as affirming as the word "alliance" or "acceptance." To him, "tolerance" means "to put up with" in the sense that "Jews" and "Blacks" used to be "put up with" until they were finally "accepted." Though the group's mission statement includes the word tolerance, Colin had objected to the word's use to McMillan when she drafted the mission statement (even though it was not ultimately changed). Because Colin does not believe in "tolerance" and instead believes in "acceptance," the Board's suggested name change would indicate a club that is not only more general than the one he wants, but also a club that merely promotes "tolerance," far less than he hopes to achieve. For all of the reasons that Zetin and Colin mentioned when talking about being forced to change the club's name, the Board's suggested name change clearly infringes on profound expressive meaning that the group attaches to its name.

Similarly, the suggestion that the group incorporate a statement that it will not talk about sexual activities, while not requiring other groups to add a similar statement, was hurtful according to Colin and Zetin. Even though they had no plans to talk about sexual activities in the group, singling their group out by requiring their mission statement to include a prohibition on discussion of sexual activities would harm their freedom of expression. Zetin said that adding the requirement when no other groups have the requirement would intimate that "gay people are inherently more sexual than others." She testified that you can talk about being gay without talking about having sex, just as you can talk about being heterosexual without talking about sex. Plaintiffs' counsel sensibly analogized it to requiring a Catholic group to add a statement that it would not be intolerant of other religions. Even if the Catholic group would gladly state that it did not intend to be intolerant of other religions, singling that student group out to add a statement based on a stereotype that Catholics are intolerant of other religions, and requiring the group to add a

disclaimer to their mission statement, would be forced speech that could greatly harm their expressive rights. Furthermore, Colin and Zetin have stated to Defendants and under oath in court that the group does not intend to talk about sexual activity, and would readily accept a statement in their mission statement that they will not talk about it if *all* groups are required to include the statement.

Plaintiffs have presented a considerable amount of evidence to show that Defendants denied them access to the "limited open forum" based on the content of the proposed speech at Gay–Straight Alliance meetings. First, Assistant Superintendent McKinnon had told Principal Murray to be on the look-out for such clubs in the spring of 1998, approximately a year and a half before Colin applied to form the club. Second, in the spring of 1999 the California Legislature considered legislation (A.B. 222) that would prohibit discrimination based on sexual orientation in public schools. The Board passed a resolution opposing the bill and sent it to the Legislature. *See* Second Codell Decl., Ex. I (Board Resolution No. 32–98–99 and Minutes of May 13, 1999 Board Meeting). According to the Board Minutes, Defendant Board Member Jacobson moved to adopt the resolution against the bill because he claimed that certain sexual behavior, like homosexuality, "would be accepted and validated in the public school system, which would go against the religious and moral beliefs of most people." *Id.* The Resolution was passed unanimously. The Legislature passed the law in revised form as A.B. 537 despite the Board's disapproval. *See* 1999 Cal. A.B. 537, Stats.1999, ch. 587. Third, the Board reviewed the application of the student group unlike any other student group that had been proposed before. The Board subjected the application to a long delay and ultimately voted it down unanimously. During consideration of the application at the November 18, 1999 meeting, Defendant Board Member Bill Lewis said, "The Bible says we're all sinners, but this, in my opinion, is

asking us to legitimize sin." Codell Decl., Ex. A. Kathy Ward's statement cited a concern about "unrestricted, unsupervised student led discussion of sexual topics" even though Plaintiffs had a faculty advisor who would be present at all meetings of the group if it were recognized. Plaintiffs have made a preliminary showing not just of a content-based denial of student recognition, but a pattern of delay and discrimination against the Plaintiffs on the basis of sexual orientation or perceived sexual orientation.

In addition, Defendants' contention that the Plaintiffs were not denied access to the "limited open forum" since their application was only conditionally denied does not hold up under scrutiny. Even though the suggested changes would violate the Equal Access Act as detailed above, there is little reason to believe that any club dealing with homophobia and discrimination based on sexual orientation would have been approved no matter what the title and the mission statement said. The Court finds that the moderate position taken in court by Defendants, that the club would be approved with a few "modest" changes, is not credible. Absent the threat of litigation and court-ordered enforcement of the students' rights, Defendants were unlikely ever to recognize the club.

If this Court were to allow the School Board to deny recognition to the Gay–Straight Alliance, it would be guilty of the current evil of "judicial activism," carving out an exception from the bench to the statute enacted by the politically accountable Congress. If this Court were to interpret the Equal Access Act differently than courts have in the past when applying the Act to Christian groups, it would be complicit in the discrimination against students who want to raise awareness about homophobia and discuss how to deal with harassment directed towards gay youth.

The Board Members may be uncomfortable about students discussing sexual orientation and how all students need to accept each other, whether gay or straight. As in *Tinker*, however, when the school administration was uncomfortable with students wearing symbols of protest against the Vietnam War, Defendants can not censor the students' speech to avoid discussions on campus that cause them discomfort or represent an unpopular viewpoint. *See* 393 U.S. at 509, 89 S.Ct. 733. In order to comply with the Equal Access Act, Anthony Colin, Heather Zetin, and the members of the Gay–Straight Alliance must be permitted access to the school campus in the same way that the District provides access to all clubs, including the Christian Club and the Red Cross/Key Club. Plaintiffs have shown a strong likelihood of succeeding on their claim that Defendants have violated their rights under the Equal Access Act.

### D. First Amendment Claim

In finding that the District has likely violated the Equal Access Act, the Court need not reach Plaintiffs' First Amendment claim.

### E. Plaintiffs Will Be Irreparably Injured Absent Preliminary Relief

 "The loss of First Amendment freedoms, for even minimal periods of time unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976). Even though the Court does not reach the First Amendment issue, the same presumption of irreparable harm arises in the case of violations of the Equal Access Act because it protects "expressive liberties." *Hsu v. Roslyn Union Free School Dist. No. 3*, 85 F.3d 839, 872 (2nd Cir.1996) (finding that the denial for one year of an after-school Bible group constituted "irreparable injury" and issuing a preliminary injunction). Plaintiffs have already missed an entire semester, which is a significant portion of the time that they will spend in high school. Because Zetin is a junior, she has only a year and a half left before she graduates. By the time this matter is resolved in court, Zetin may have graduated.

Plaintiffs have been injured not only by the Board's excessive delay, but also by the inability to effectively address the hardships they encounter at school every day. Some students at El Modena do not even feel safe using the school's restrooms. Zetin is often harassed by students calling her a "dyke." While such harms may not be cured by a preliminary injunction, "gay-straight alliance clubs provide a safe place for students ... [and] create a respectful environment where students realize that they have a place at the table ..." Gogin Decl., ¶¶ 7–9. Without official recognition for nearly six months, the students have not had the same privileges as other student groups and have been burdened by having to meet across the street from their school. Thus, even without the presumption of irreparable harm in the area of free speech, the urgency of this matter and the inadequacy of legal remedies mandates preliminary relief.

The balance of hardships also tips sharply in favor of Plaintiffs. Weighing in favor of the Plaintiffs is the burden on their expressive rights, an injury of the highest magnitude. Defendants argue that if they are forced to recognize the Gay–Straight Alliance, the parental notification laws of the California Education Code will be triggered and they will be forced to send out costly mailings whenever the group meets. The Board estimates this cost at over $1000 each week. See Van Otterloo Decl., ¶ 15. This argument, like many of the other arguments put forth by the Board, appears to be pretextual. Plaintiffs have demonstrated that the parental notification requirements deal with school-sponsored instruction, not noncurriculum related, intra-student speech during noninstructional time. See Pltf.'s Reply Memo, at 14. When other gay-straight alliance clubs in California meet, including clubs from Orange County, their existence does not trigger the parental notification requirements of the Education Code. See Gogin Decl., ¶ 5. Even if the Education Code were triggered, at most, it requires the school to notify parents once at the begin-ning of the school year. See Cal.Educ. Code. §§ 51550, 51554.

Granting a preliminary injunction would also be in the public interest. Recent California legislation confirms that it is state public policy to prevent discrimination on the basis of sexual orientation. In passing the California Student Safety and Violence Prevention Act of 2000, the California Legislature found that "[v]iolence is the number one cause of death for young people in California and has become a public health problem of epidemic proportion" and "[t]he fastest growing, violent crime in California is hate crime." 1999 Cal. A.B. 537, Stats. 1999, ch. 587 § 2. The Legislature felt that "it is incumbent upon us to ensure that all students attending public school in California are protected from potentially violent discrimination." Id. The California Penal Code already contained a prohibition on hate crimes based on sexual orientation. See Cal.Penal Code § 422.6 (barring injury "because of the other person's race, color, religion, ancestry, national origin, disability, gender, or sexual orientation"). In passing ch. 587, however, the Legislature added sexual orientation to the list of prohibited forms of discrimination in public schools. See 1999 Cal. A.B. 537, Stats. 1999, ch. 587 § 3. In addition to protecting students from hate crimes, the Legislature was also concerned about suicide. According to the preamble:

[W]e must strive to reverse the increase in teen suicide. The number of teens who attempt suicide, as well as the number who actually kill themselves, has risen substantially in recent years. Teen suicides in the United States have doubled in number since 1960 and every year over a quarter of a million adolescents in the United States attempt suicide. Sadly, approximately 4,000 of these attempts every year are completed. Suicide is the third leading cause of death for youths 15 through 24 years of age. To combat this problem we must seriously examine these grim statistics and take immediate action to ensure all

students are offered equal protection from discrimination under California law.

1999 Cal. A.B. 537, Stats.1999, ch. 587 § 2. By adding sexual orientation to the list of prohibited forms of in-school discrimination, the Legislature could specifically target the teen suicide rate. According to a Center for Disease Control and Prevention analysis of Massachusetts statistics in 1997, gay students were more than six times as likely to have tried suicide as straight students. *See* John Ritter, *Gay Students Stake Their Ground,* USA Today, Jan. 18, 2000 at 2A (citing study). This injunction therefore is not just about student pursuit of ideas and tolerance for diverse viewpoints. As any concerned parent would understand, this case may involve the protection of life itself. Since the Gay–Straight Alliance seeks to end discrimination on the basis of sexual orientation, a preliminary injunction requiring the Board to recognize the club would be consistent with state public policy and in the public interest.

In addition to demonstrating a strong likelihood that Defendants have violated the Equal Access Act, Plaintiffs have also shown a significant threat of irreparable injury, greater hardship to Plaintiffs than Defendants, and that the public interest favors granting the injunction. The Court finds that a preliminary injunction is warranted under these circumstances.

### III. Disposition

Plaintiffs' Motion for a Preliminary Injunction is GRANTED. Plaintiffs are hereby ordered to prepare, lodge and serve a proposed preliminary injunction consistent with this Order.

Further, the Court finds that the bond requirement under Federal Rule of Civil Procedure 65(c) is excused. Because the Court finds that there is a strong likelihood of success on the merits by Plaintiffs, no bond is necessary. *See Scherr v. Volpe,* 466 F.2d 1027, 1035 (7th Cir.1972). In addition, because the Court has found that the parental notification provisions of the Education Code are not triggered by the meetings of the Gay–Straight Alliance, the Court excuses the bond requirement because there is no risk of monetary loss to the Defendants if the injunction is granted. *See Frank's GMC Truck Center, Inc. v. G.M.C.,* 847 F.2d 100, 103 (3rd Cir.1988).

IT IS SO ORDERED