### BOYD COUNTY HIGH SCHOOL GAY STRAIGHT ALLIANCE, et al. Plaintiffs

### v.

### BOARD OF EDUCATION OF BOYD COUNTY, KY, et al. Defendants

### No. CIV.A.03–17–DLB.

United States District Court, E.D. Kentucky, Ashland Division.

April 18, 2003.

---

tioned about felony charges nor threatened with felony charges.

**21.** *See supra* Part II.A.

Edward E. Dove, Lexington, KY, James D. Esseks, Tamara Lange, American Civil Liberties Union, New York, NY, David A. Friedman, Fernandez, Friedman, Grossman & Kohn, Louisville, KY, for Boyd County High School Gay Straight Alliance, David Fannin, Kaye King, Lena Reese, Libby Fugett, Sarah Alcorn, Sydney Duarte, Tyler McClelland, William Carter, Plaintiffs.

Winter R. Huff, John G. Prather, Jr., Law Offices of John G. Prather, Somerset, KY, Kimberly S. McCann, VanAntwerp, Monge, Jones & Edwards, Ashland, KY, for Boyd County Board of Education, Chester Tackett, Jerry Johnson, Randall Stapleton, Sheri Bryan, Teresa Cornette, Theresa Jackson, William Capehart, Defendants.

## OPINION & ORDER

BUNNING, District Judge.

### I. INTRODUCTION

This matter is before the Court on Plaintiffs' Motion for a Preliminary Injunction. (Doc. # 3). Plaintiffs claim that Defendants violated their rights under the Equal Access Act, 20 U.S.C. § 4071, *et seq.*, and their First Amendment rights of expression and association by denying the Boyd County High School Gay Straight Alliance the same access to school facilities given to other student groups. Plaintiffs also claim that Defendants violated the Kentucky Education Reform Act (hereinafter KERA).

Plaintiffs seek a preliminary injunction requiring Defendants to offer them the same opportunities given to other student groups at Boyd County High School. Plaintiffs assert that affording them the same opportunities includes authorization to meet at school during noninstructional time, to use the school hallways and bulletin boards for posters, and to use the intercom to make club announcements during home room.

The Court heard testimony during a two-day evidentiary hearing held on March 18 & 19, 2003. The transcript of that hearing has been filed of record, and each side has filed its proposed findings of fact and conclusions of law. (Docs. # 25 & # 27) The parties also filed a Joint Stipulation of Facts. (Doc. # 26).

Plaintiffs' motion is now ripe for adjudication. Because Plaintiffs have alleged violations of their constitutional rights as well as laws of the United States, to wit, the Equal Access Act, 20 U.S.C. § 4071 *et seq.*, this Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331, and supplemental jurisdiction over Plaintiffs' state law claim. Based upon the evidence presented at the hearing and evidence filed in the record, the Court enters the following findings of fact, which findings outline the background of the dispute and are relevant to adjudicating the preliminary injunction request. These findings are numbered for ease of reference in subsequent sections of this Opinion and Order.

## II. FINDINGS OF FACT

1. Plaintiffs are a student organization known as the Boyd County High School Gay Straight Alliance ("GSA"), seven student members of the GSA, and the GSA's faculty advisor, Kaye King. Joint Stipulation of Facts ("Joint Stip.") ¶ 1; 3/18/03 Transcript of Preliminary Injunction Hearing, Day One (hereinafter "3/18/03 Tr.") at 37:8–17 (McClelland); 135:16–18 (King). The student members attend Boyd County High School ("BCHS") in Cannonsburg, Kentucky. Joint Stip. ¶ 3. BCHS is a public school. The County School System re-

ceives federal funding. 3/18/03 Tr. at 281:20–23 (Capehart); Joint Stip. ¶ 4.

2. Defendants are the Board of Education of Boyd County, Kentucky (the "Board"); Board members Chester Tackett, Theresa Jackson, Randall Stapleton, Sheri Bryan and Teresa Cornette, in their official capacities; the Boyd County School District Superintendent Dr. William Capehart, in his official capacity; and BCHS Principal Jerry Johnson, in his official capacity. Joint Stip. ¶ 5.

3. In January or February of 2002, students at BCHS circulated a petition to create a GSA Club. 3/18/03 Tr. at 37:8–38:12 (McClelland); 136;8–13; 137:1–10 (King); 230:2–4; 249:16–20 (Reese). The purpose of the GSA Club is to provide students with a safe haven to talk about anti-gay harassment and to work together to promote tolerance, understanding and acceptance of one another regardless of sexual orientation. Joint Stip. ¶ 6; 3/18/03 Tr. at 37:8–38:12 (McClelland); 273:3–12 (Fannin); 207:20–208:3 (Fugett); 269:16–25 (Duarte); Declaration of Lena Reese ("Reese Decl.") at ¶¶ 2–3; Declaration of Sarah Alcorn ("Alcorn Decl.") at ¶¶ 2–3; Declaration of William Carter ("Carter Decl.") at ¶¶ 2–3; Declaration of David Fannin ("Fannin Decl.") at ¶ 2; Declaration of Libby Fugett ("Fugett Decl.") at ¶¶ 2–3; Declaration of Sydney Duarte ("Duarte Decl.") at ¶¶ 2–3. Plaintiff Tyler McClelland testified that the GSA's core principle is that people should be treated equally as human beings regardless of their sexual orientation. 3/18/03 Tr. at 40:18–41:7 (McClelland).

4. Anti-gay harassment, homophobia, and use of anti-gay epithets have been and continue to be serious problems at BCHS.[1]

---

1. One example of the harassment includes students in Plaintiff Fugett's English class stating that they needed to take all the fucking faggots out in the back woods and kill them. 3/18/03 Tr. at 222:23–223:12 (Fugett); Decla-

ration of Kaye King ("King Decl.") at ¶ 35, Exh. J. This occurred in October, 2002. During a basketball game in January 2003, students with megaphones chanted at Plaintiff Reese: "faggot-kisser," "GSA" and "fag-lov-

One student dropped out of BCHS because of harassment based on sexual orientation and another student dropped out because of both anti-gay harassment at school as well as problems at home. 3/19/03 Tr. at 6:13–7:18 (Johnson); 3/18/03 Tr. at 136:21–23; 138:9–139:3; 174:6–18 (King).

5. During the Spring 2002 semester, Kaye King, a BCHS English teacher, was made aware of a petition being circulated among the students to start a GSA Club at the high school. 3/18/03 Tr. at 136:9–13 (King). King discussed the GSA petition with BCHS Principal Jerry Johnson. He informed her that the student who started the petition had already come to see him and that BCHS would have a GSA Club because the student knew a great deal about the legal issues. Principal Johnson's only concern at that time was the need to approve the GSA Club in order to prevent a lawsuit against the School District. 3/18/03 Tr. at 136:24–137:10 (King). King also discussed the idea of a GSA Club with Superintendent Bill Capehart. 3/18/03 Tr. at 137:20–24 (King). Dr. Capehart told King that having a GSA Club was the right thing to do for all students and that the School District needed the students to follow through with starting the GSA Club at BCHS. 3/18/03 Tr. at 138:5–8 (King).

6. The student who started the GSA Club petition later approached King, who agreed to be the GSA Club faculty sponsor. Joint Stip. ¶ 8; 3/18/03 Tr. at 137:11–15 (King).

7. After it became known that a group of BCHS students were trying to start a GSA Club, some controversy ensured in the school hallways which continued for about a month. Students who opposed the GSA wore shirts to school that said, "Adam and Eve, not Adam and Steve" or "I'm straight." 3/18/03 Tr. at 139:25–140:10 (King); 38:16–20 (McClelland).

8. In February 2002, a group of students decided to apply for club status for the GSA. School administrators asked them to wait until the controversy about the GSA died down in the community and the school. The students agreed to wait a month before submitting their GSA Club application. 3/18/03 Tr. at 44:12–23 (McClelland); 140:9–19 (King).

9. In late February or early March 2002, the BCHS Diversity Awareness Council ("DAC"), a special advisory group on diversity and equity issues, held two meetings that included discussion of anti-gay harassment at BCHS and the proposed GSA Club. 3/18/03 Tr. at 41:8–16; 41:25–42:4 (McClelland). During the first meeting, student safety was discussed, prompting a suggestion that the GSA Club use a different name. 3/18/03 Tr. at 41:17–42:21 (McClelland). Students who supported formation of the GSA Club unanimously rejected the suggested name change. Plaintiff McClelland testified: "[w]e felt that the aim of the club was to ... promote understanding and tolerance; and if we were to exclude the word 'gay' from the name, then that would be a very defeatist thing to do." 3/18/03 Tr. at 43:5–20 (McClelland). During the second DAC meeting, Board Member Chester Tackett stated that the GSA Club might be necessary to help deal with the harassment problem. 3/18/03 Tr. at 43:21–44:6 (McClelland).

er." 3/18/03 Tr. at 234:18–235:2 (Reese). On a regular basis, students call out "homo," "fag," and "queer" behind Plaintiff McClelland's back as he walks in the hallway between classes. 3/18/03 Tr. at 72:18–20 (McClelland); Declaration of Tyler McClelland ("McClelland Decl.") at ¶¶ 5–6. On

April 10, 2002, during an observance of National Day of Silence, about 25 participants sat in a circle in the front lobby of BCHS. During the lunch hour observance, protesters used anti-gay epithets and threw things at them. 3/18/03 Tr. at 69:9–24; 80:24–82:3 (McClelland).

10. BCHS requires all clubs to apply to its governing body, the Site–Based Decision Making Council (the "Council"), for official recognition. The Council consists of three teachers, two parents, and Principal Jerry Johnson. 3/18/03 Tr. at 88:12–20 (Alcorn).

11. In late March 2002, the GSA submitted its first club application. Plaintiff Exhibit ("PX") 12. Although Principal Johnson had asked the students to wait a month before applying for club status, the Council denied the GSA's application because it came too late in the school year. 3/18/03 Tr. at 44:12–45:9 (McClelland); 140:10–141:3 (King). Faculty Advisor King spoke with Principal Johnson one week later. He assured her that all clubs would be reapplying in the fall of the new school year and that, in a stack of club applications, no one would notice the GSA's application and it would slide right through. 3/18/03 Tr. at 141:4–9 (King).

12. In September 2002, the GSA's application for club status was resubmitted. 3/18/03 Tr. at 144:7–10 (King). During its first meeting for the 2002–03 school year, the council approved 20 club applications. PX 1. Plaintiff GSA was the only application not approved. *Id.* Among the clubs which were approved were the Human Rights Club, 4–H, Future Business Leaders of America ("FBLA"), Beta Club, Future Farmers of America ("FFA"), Future Career and Community Leaders of America ("FCCLA"), Health Occupation Student Organizations ("HOSA"), and Y–Club. *Id.* The Fellowship of Christian Athletes ("FCA") was also approved. *Id.* The FCA is synonymous with the Christian Fellow Club and the Bible Club. 3/18/03 Tr. at 184:13–23 (King). The Drama, Key and Pep Clubs were not approved at that time because of late submissions. PX 1.

13. With the exception of HOSA, each approved organization in ¶ 12 *supra* was identified as a club by BCHS in its 2001–02 student handbook list of extra-curricular activities. PX 9.

14. Following this denial of the GSA's application for club status, the ACLU wrote a letter to the Council on behalf of the GSA. That letter set forth the requirements of the Equal Access Act. Joint Stip. ¶ 11; 3/18/03 Tr. at 144:7–15 (King).

15. GSA members asked the Council to reconsider GSA's application at its next meeting. Although the Council received the ACLU's letter before it met at the end of September, the Council tabled reconsideration of the GSA's application until the Council's October 28, 2002, meeting. 3/18/03 Tr. at 144:12:145:8 (King).

16. The Board's policy on use of school facilities by noncurriculum-related student groups is tailored after the language of the Equal Access Act, 20 U.S.C. § 4071, *et seq.* DX 9. That policy states, in pertinent part:

APPROVAL REQUIRED

Non-curriculum-related secondary student groups may be provided meeting space on application to and approval by the Principal. Space shall only be provided during noninstructional time either before the beginning or after the conclusion of the school day.

PROVISIONS

All meetings of non-curriculum-related student groups shall be voluntary. No meeting shall be sponsored by the District or any of its employees. All such meetings shall be student initiated, directed, conducted, and controlled. Non-school personnel may not regularly attend such meetings nor attempt to direct, control, or conduct the same. Agents or employees of the District may attend religion-related meetings only in a non-participatory capacity.

PERMISSION MAY BE DENIED

Permission to use school facilities may be denied where reasonable cause exists

to believe the meeting will materially and substantially interfere with the orderly conduct of the educational activities of the school or pose a danger to the health, safety, or welfare of the students in attendance or to school property.

*Id.* The Board's policy does not reference the Site Based Decision Making Council.

17. On October 28, 2002, the Council held its meeting in the BCHS auditorium. The Council went immediately into executive session. When it returned, the Council approved the applications of three organizations: Key Club, Drama Club and the GSA Club. 3/18/03 Tr. at 88:21–89:5 (Alcorn).[2] GSA members in the audience remained silent after the announcement. *Id.* at 89:6–8 (alcorn).

18. After the Council announced its decision approving the GSA Club, the reaction from GSA opponents was acrimonious. Principal Johnson described the reaction as one of "open hostility." 3/19/03 Tr. at 8:21–25 (Johnson). The crowd directly confronted the GSA supporters "with facial expressions, hand gestures . . . some very uncivil body language . . . people were using loud voices and angry voices and, again, beginning to point . . . it took some effort just to calm the meeting down and get through it and get out of there . . . that was the first time that I stared into the face of someone that I thought would hurt someone involved in this issue if given the opportunity. That was alarming to me and frightening and disheartening." 3/19/03 Tr. at 10:1–11:3 (Johnson).

19. Board Member Teresa Cornette's observations from the October 28, 2002, meeting were similar. Cornette "was appalled at the reaction of the group, the audience. There was nothing but hatred in that room and ignorance showed by moms and dads and grandparents. When I left that meeting, I honestly thought that, you know, yes, a GSA is very much needed in our community, and these people right here needed to be mandated to go to it. It was horrible. And I literally left that meeting with a fear of what was going to happen in our school the next few days. I believe that we can teach tolerance and we can teach it until we are blue in the face, but if our parents don't teach it to our children also, then it's almost like a losing battle." 3/19/03 Tr. at 60:20–61:8 (Cornette).

20. In response to a GSA opponent's questioning of why the GSA Club was approved, the Council explained that it thought it was doing the right thing based on the law and in light of the hostile environment in the school. 3/18/03 Tr. at 89:9–90:19 (Alcorn).

21. After the Council's October 28, 2002, decision to approve the GSA Club's application, the school sent a letter to all staff and parents of BCHS children, explaining its rationale for approving the GSA Club. PX 2 (staff version); PX 14 (parent version). In that letter, the school stated:

> [I]n accordance with the federal Equal Access Act, all clubs that had submitted a request to organize were approved, including the Gay–Straight Alliance. Personal feelings aside, the Council cannot knowingly and in good faith violate the law. . . .

*Id.* In that correspondence, the BCHS identified several clubs as noncurricular, including 4–H, Key Club, Beta Club, Fellowship of Christian Athletes, and Christian Fellowship Club. *Id.* FBLA, FFA, FCCLA, HOSA, and Drama club were among the clubs identified as curricular. *Id.*

---

**2.** Local ministers appealed the Council decision to approve the GSA Club to the Superintendent and circulated a petition to stop the GSA Club. Joint Stip. ¶ 16; PX 3. The Council's decision was affirmed by Superintendent Capehart. Joint Stip. ¶ 17; PX 4.

22. On October 30, 2002, two days after the Council approved the GSA Club and before the GSA Club was able to conduct its first official meeting, a group of students congregated outside the school doors in the morning before school to protest the Council's decision and the existence of the GSA Club. The protesters shouted at other students as they arrived at school, "If you go inside, you're supporting the GSA;" "We don't want something like that in our school;" and "If you go inside, you're supporting faggots." Joint Stip. ¶ 12; 3/18/03 Tr. at 94:13–95:5 (Alcorn). Approximately 100 of BCHS's 974 enrolled students remained outside during the protest. Joint Stip. ¶ 13; 3/19/03 Tr. at 11:25–12:5 (Johnson). This protest did not, however, prevent students from entering the school. 3/18/03 Tr. at 95:6–11 (Alcorn).

23. During that protest no GSA member spoke to any protester or engaged in any sort of counter-demonstration. Rather, members proceeded into school when the bell rang. 3/18/03 Tr. at 208:24–209:16 (Fugett); 95:14–22 (Alcorn). Several GSA members talked about the protest going on outside and decided that they should remain calm and ignore it in order to avoid provoking the protestors. 3/18/03 Tr. at 209:13–16 (Fugett).

24. Principal Johnson and Assistant Principal Richard Cyrus spoke to the crowd outside the school. They granted them amnesty for refusing to go to home room, saying, "You had your picket here. You've had your disagreement, but now it's time to go back to class." 3/19/03 Tr. at 205:1–12 (Cyrus). Principal Johnson and Assistant Principal Cyrus also allowed students who did not want to come into the school building to move to the parking lot to continue their protest. Id. One group moved to the parking lot to continue their protest; the rest entered the school building. 3/18/03 Tr. at 96:14–24 (Alcorn). Classes proceeded as scheduled that day without any disruption. 3/18/03 Tr. at 97:4–8 (Alcorn).

25. On November 4, 2002, approximately one-half of the BCHS student body was absent from school. 3/19/03 Tr. at 12:6–11 (Johnson).

26. Neither the October 30, 2002, on-campus protest nor the November 4, 2002, school boycott disrupted regularly-scheduled classroom activities, prevented teachers from teaching, or prevented students who came to school from learning. 3/19/03 Tr. at 205:13–20 (Cyrus); 243:12–19 (Capehart); 3/18/03 Tr. at 83:24–84:14 (McClelland); 131:17–132:9 (Alcorn); 210:4–7 (Fugett). Faculty Advisor King reported that in November she received threatening notes from students and her car was "keyed." But that harassment did not disrupt classroom activities, prevent her from teaching or prevent students from learning. King Decl. at ¶ 36; 3/18/03 Tr. at 83:24–85:5 (McClelland).

27. After the Council's decision to approve the GSA Club, hostility from the anti-GSA faction in the community increased. The hostility shifted from Principal Johnson and the Council to members of the Board of Education and Dr. Capehart. Joint Stip. ¶ 15; 3/19/03 Tr. at 34:16–35:4 (Johnson).

28. Superintendent Capehart, School Board members, and BCHS administrative staff received many telephone calls from parents regarding the formation of the GSA Club. Many of these parents expressed concern over the education and safety of students and staff. 3/19/03 Tr. at 234:18–235:10 (Capehart); Tr. at 43:9–17 (Bryan); Tr. at 201:19–202:21 (Cyrus). Additionally, according to Assistant Principal Cyrus, many parents were irate and wanted to remove their children from BCHS immediately. Cyrus spent a great deal of time dealing with those angry parents and teachers who, like many in the

general public, opposed the school's approval of the GSA Club. 3/19/03 Tr. at 203:14–204:4; 212:24–214:23; 217:1–7 (Cyrus). Nevertheless, Defendants are unable to identify a single student taken out of the school district because the GSA Club was formally recognized. 3/19/03 Tr. at 244:13–19 (Capehart).

29. The record reflects only one documented instance of classroom disruption caused by GSA members or supporters—an incident where a student left a particular classroom because of supposed pressure from GSA supporters.[3] 3/19/03 Tr. at 226:8–22 (Bailey). Other than this one instance, Defendants have not elicited any evidence that GSA members or GSA Club meetings were disruptive. 3/19/03 Tr. at 216:12–20 (Cyrus); 3/18/03 Tr. at 93:10–15, 95:14–18, 97:6–8 (Alcorn); 3/18/03 Tr. at 152:14–19, 202:1–4 (King); 3/18/03 Tr. at 208:17–23, 209:10–16, 210:4–7 (Fugett); 3/18/03 Tr. at 273:13–23 (Fannin); 3/19/03 Tr. at 23:25 –24:4, 32:1–18, 32:23—33:3 (Johnson).

30. On December 16, 2002, Dr. Capehart proposed that the Council ban all noncurricular clubs for the remainder of the 2002–03 school year. Defendant Exhibit ("DX") 6. Although Defendants had described Beta and Key Clubs as noncurricular clubs just six weeks earlier, Dr. Capehart listed those clubs as curricular in his proposal. *Id.* Dr. Capehart admitted that he came up with the proposal to ban all noncurricular clubs to put an end to the fury surrounding the GSA. 3/18/03 Tr. at 303:24–304:9 (Capehart). That same day, the Board met and considered a motion to stop acknowledging all noncurricular clubs, in keeping with Dr. Capehart's proposal, and to write a "closed forum" policy to be implemented in July 2003. 3/19/03 Tr. at 65:22–66:6 (Cornette).

31. On December 17, 2002, the Council met and declined to vote on Dr. Capehart's proposal, effectively defeating it and allowing the GSA Club to continue to meet at BCHS. 3/18/03 Tr. at 100:10–101:22 (Alcorn); 3/19/03 Tr. at 146:14–147:5 (Sandy Thornbury); King Decl. at ¶ 30.

32. On December 20, 2002, the Board held an emergency meeting and voted unanimously to suspend all clubs, both curricular and noncurricular, at BCHS for the remainder of the school year, effective immediately until July 1, 2003. PX 18. Defendants' decision to ban all clubs at BCHS was motivated by a desire, in part, to stop the disruption surrounding the existence of the GSA Club at BCHS. PX 25 (Capehart affidavit ¶ 6); 3/18/03 Tr. at 309:12–23 (Capehart); 3/19/03 Tr. at 46:12–17, 55:18–56:2 (Bryan).

33. The disruption to which Defendants were responding when they acted to ban all clubs on December 20, 2002, was caused by opponents of the GSA rather than by supporters of the GSA. 3/18/03 Tr. at 297:22—302:11, 3/19/03 Tr. at 228:22–229:25, 233:5–234:4 (Capehart); 3/19/03 Tr. at 60:1–61:14, 68:4–16 (Cornette); DX 14 (Cornette letter); 3/19/03 Tr. at 41:18–43:17, 45:11–25, 47:6–18, 51:2–19 (Bryan); 3/19/03 Tr. at 32:23–33:11; 34:16–35:4 (Johnson); 3/19/03 Tr. at 218:24–219:8 (Cyrus). Cyrus testified that none of the controversies or issues surrounding the GSA were provoked or instigated in any way by GSA supporters. 3/19/03 Tr. at 216:12–20 (Cyrus). Throughout the controversy over the GSA, Cyrus's concerns about any threat or danger to students or staff were "[m]ainly from the people who were rallying, you know, against the GSA[.]" 3/19/03 Tr. at 212:13–213:22 (Cyrus). Unlike most "hot topics" at BCHS over the past 18

---

**3.** Although Board Member Cornette testified that GSA supporters had been generally disruptive and abrasive in obtaining signatures for their petition (3/19/03, Tr. at 64:20–65:14), this testimony was not based on personal observation.

years, the dispute over the GSA was "more of a community issue" rather than a "student on student" issue. 3/19/03 Tr. at 218:15–219:8 (Cyrus).

34. On January 2, 2003, Principal Johnson visited King in her classroom and told her that the GSA Club could apply to use school facilities as an outside organization before and after school hours but would not be permitted to meet during home room. 3/18/03 Tr. at 148:14:149:1 (King). On behalf of the GSA Club, King submitted a request for permission to use her classroom for GSA Club meetings once a week before school. PX 7; 3/18/03 Tr. at 149:2–10 (King). On January 7, 2003, Principal Johnson and Dr. Capehart denied the GSA Club's facilities use application. Principal Johnson told King that no "groups" or "clubs" would be allowed to meet on school grounds. PX 7; King Decl. at ¶ 32.

35. Since the Board's action purportedly banning all clubs, the GSA Club has not held meetings at school, made announcements over the intercom, posted notices in the hallways or listed activities in the school newspaper. While students who were GSA Club members have gathered at times in King's classroom before and during home room, no GSA Club business has been conducted during that time or on BCHS premises since December 20, 2002. 3/18/03 Tr. at 149:4–150:23, 176:9–23 (King). Although 20 to 30 GSA Club members regularly attended GSA Club meetings at BCHS prior to the purported ban on club meetings, only 6 members have been able to attend off-campus meetings since December 20, 2002. 3/18/03 Tr. at 149:23–150:23 (King); 80:15–23 (McClelland).

36. Despite the Board's December 20, 2002 action purporting to suspend all clubs, Defendants have permitted and continue to permit many student groups to meet at BCHS during noninstructional time; that is, before school, after school, and during home room. Home room is a 20 to 25 minute period in which teachers take attendance and any flyers or announcements can be handed out to students. There is no formal teaching during home room and it is noninstructional time. Joint Stip. ¶¶ 18, 19; 3/18/03 Tr. at 48:2–10 (McClelland).

37. Many student organizations have continued to use BCHS facilities during noninstructional time since December 20, 2002. They include the Kentucky United Nations Assembly ("KUNA"), formerly known as the Y-club, Mock Trial and Teen Court, Academic Teams, Athletics Teams, and Cheerleading squads.

38. Additional groups using the school facilities since December 20, 2002, are: Future Farmers of America (FFA), Future Career and Community Leaders of America (FCCLA), Future Business Leaders of America (FBLA), and Health Occupation Student Organizations (HOSA). Defendants concede this fact. (Doc. # 25 at pp. 10, 12–15). According to Boyd County Assistant Superintendent Dr. Dawn Tackett, maintenance of these student organizations is required for the career and technical education program to be in compliance with state regulation. 3/19/03 Tr. 79:17–80:25 (Tackett). The curriculum guide for the Boyd County Career and Technical Education Center, described during the injunction hearing as "East Campus", includes a reference to FFA, FCCLA, and HOSA as opportunities for student involvement. PX 31. Dr. Tackett explained that curriculum courses such as marketing or home economics require student organizations to be in compliance with state regulation on technical education programs. 3/19/03 Tr. 80. Indeed, participation in an agriculture class requires participation in FFA activities. *Id.* at 83–84.

39. The pre and post December 20, 2002, activities of four student groups—Drama Club, Bible Club, Executive Councils, and Beta Club—are of particular relevance for purposes of the pending motion for preliminary injunctive relief. Review of the activities of each of these groups is pertinent to subsequent analysis of the merits of Plaintiffs' motion.

### Drama Club

40. Prior to December 20, 2002, Lynn Hutchinson, a teacher at BCHS, was the faculty advisor for the Drama Club. 3/18/03 Tr. at 317:8–12; 317:19–23 (Johnson). As faculty advisor, Hutchinson submitted an application for the Drama Club in the Fall of 2002. 3/19/03 Tr. at 115:11–14 (Hutchinson). That application was approved. 3/19/03 Tr. at 116:19–117:3 (Hutchinson); PX 1.

41. During the Fall of 2002, Hutchinson selected a play, held open auditions, and chose the actors for the play, just as she had done in other years. 3/19/03 Tr. at 100:17–101:7; 112:5–113:18 (Hutchinson).

42. Since December 20, 2002, Hutchinson has continued to direct the same group of students in their after-school rehearsals. 3/18/03 Tr. at 317:8–23 (Johnson). These same students have frequently met since December 20, 2002, in the BCHS auditorium after school to rehearse for a play that will be performed at school, 3/18/03 Tr. at 49:5–14 (McClelland); 108:15–24 (Alcorn); 195:12–18 (King); 317:8–18 (Johnson); 3/19/03 Tr. at 100:17–101:7 (Hutchinson), have used the intercom during home room to call participating students to meetings related to play practice, 3/18/03 Tr. at 118:9–14 (Alcorn); 177:15–19 (King), and have listed the names of people in this drama group on a bulletin board in the hallway outside Ms. Thornbury's classroom. Alcorn Decl. at ¶ 7.

43. Student participation in the play is not required for any course and does not result in academic credit, despite the fact that teachers have the option of requiring their students to *watch* a performance of the play during instructional time, and may assign course work based on discussion questions provided to students who *watch* the play. 3/18/03 Tr. at 50:12–20 (McClelland); 108:25–109:5 (Alcorn); 317:8–12; 319:17–24 321:1–2; 320:19–321:2; 322:1–3 (Johnson); 3/19/03 Tr. at 100:17–103:4, 113:20–22 (Hutchinson). Additionally, the subject matter of this drama group is not actually taught and will not soon be taught in any regularly offered course at BCHS.[4] 3/18/03 Tr. at 320:14–321:2 (Johnson); PX 30, 31.

44. Although the Defendants argue the "Drama Club" has not met or used the BCHS facilities since December 20, 2002, the Court finds that the same students who comprised the Drama Club prior to December 20, 2002, have continued to meet since that date. They simply have not used that name.

### Bible Club

45. Prior to December 20, 2002, BCHS had an active Bible Club, which was also known as the Fellowship of Christian Athletes or the Christian Fellowship Club. 3/18/03 Tr. at 184:17–185:17 (King);

---

4. Although the BCHS Curriculum Guide lists a Speech/Drama course, the Speech/Drama course was not offered in the 2001–02 academic year and is not being taught during the 2002–03 school year, nor does BCHS have any plans to teach Speech/Drama next year. 3/18/03 Tr. at 49:21–50:11 (McClelland); 3/19/03 Tr. at 99:20–25 (Hutchinson); PX 30 at 31. Moreover, while there is an "Arts & Humanities" class being taught at BCHS for the Spring 2003 semester, which includes a section on theater history, that portion of the class does not actually teach students acting or any of the other skills students would need to put on a play. 3/18/03 Tr. at 109:6–110:8 (Alcorn); 158:5–23 (King).

3/18/03 Tr. at 210:25–211:8 (Fugett); PX 1. Plaintiff Alcorn attended Bible Club meetings at BCHS with between 15 and 20 other students. 3/18/03 Tr. at 106:7–17 (Alcorn). During those meetings, Alcorn observed participants praying and holding Bibles. *Id.* at 106:23–25.

46. Since December 20, 2002, approximately 10 BCHS students who formerly met as members of the Bible Club have met in the hallway near Assistant Principal Richard Cyrus' office before school and engaged in Bible Club activities. 3/18/03 Tr. at 106:10–107:21; 118:25–119:3; 119:25–120:4 (Alcorn); 211:10–25 (Fugett); 175:11–23 (King); 211:10–25 (Fugett). The Bible Club has met in that location at least five times since December 20, 2002. 3/18/03 Tr. at 119:25–120:4 (Alcorn) The same student who was leading the Bible Club prior to December 20, 2002, has been leading the group afterwards as well. *Id.* at 107:17–21. Although Assistant Principal Cyrus testified that he never observed the Bible Club meeting outside his office after December 20, 2002, he also testified that he frequently was not in his office. 3/19/03 Tr. at 221:4–20 (Cyrus).

47. Participation in Bible Club is not required by any class at BCHS. 3/18/03 Tr. at 320:14–23 (Johnson); 3/18/03 Tr. at 107:25–108:2 (Alcorn); 3/18/03 Tr. at 161:25–162:1 (King). The subject matter of Bible Club is not actually taught or soon to be taught in any regularly offered course at BCHS. 3/18/03 Tr. at 321:20–22 (Johnson); 3/18/03 Tr. at 162:5–7 (King); 3/18/03 Tr. at 108:3–5 (Alcorn); PX 30, 31. Participation in Bible Club does not result in academic credit. 3/18/03 Tr. at 319:17–20 (Johnson); 3/18/03 Tr. at 162:2–4 (King); 3/18/03 Tr. at 107:22–24 (Alcorn). Defendants have presented no evidence that Bible Club is related to the curriculum as a whole, and the evidence shows that Bible Club activities are not related to the curriculum as a whole. Defendants

have previously recognized that the Bible Club/Christian Fellowship Club is a noncurricular student activity. PX 2.

### Executive Councils

48. BCHS has an Executive Council for each high school grade level, although the freshman and sophomore class Executive Councils are not active. 3/18/03 Tr. at 235:3–7 (Reese). Both the Junior and Senior Executive councils have met at school during noninstructional time since December 20, 2002. Joint Stip. ¶ 21; 3/18/03 Tr. at 317:8–12; 318:9–14 (Johnson); 235:3–236:24 (Reese). Junior Executive Council plans the prom and selects and organizes class rings.

49. Junior Executive Council and junior class officers have been meeting during home room in Mrs. Thornbury's room since December 20, 2002. Joint Stip. ¶ 22; 3/18/03 Tr. at 235:8–21 (Reese); PX 41 at 2.

50. Prom planning and class ring selection are not actually taught or soon to be taught in any regularly offered course at BCHS. PX 30, 31. Participation in Junior Executive Council is not required by any class, nor do students receive academic credit for participating in Junior Executive Council. 3/18/03 Tr. at 162:19–163:4 (King); 317:8–12; 319:13–320:4; 321:5–6 (Johnson). Defendants have presented no evidence that Junior Executive Council is related to the curriculum as a whole, and the evidence shows that Junior Executive Council activities are not related to the curriculum as a whole. PX 30, 31.

51. Senior Executive Council plans the senior trip, talent show, and orders the senior class t-shirts. Joint Stip. ¶ 23; 3/18/03 Tr. at 235:22–24 (Reese). Senior Executive Council has been using the intercom during home room since December 20, 2002, to make announcements for talent show auditions and for meetings to plan the senior trip. Those talent show

auditions have been held on campus after school, and the planning meetings for the senior trip have been held during home room and on campus after school. Senior Executive Council has also had access to the school newspaper since December 20, 2002. Joint Stip. ¶ 24; 3/18/03 Tr. at 235:25–236:24 (Reese); PX 41 at 2.

52. Planning a senior trip, sponsoring a talent show, and selecting senior t-shirts are not subjects that are actually taught or soon to be taught in any regularly offered course at BCHS. PX 30, 31. Participation in Senior Executive Council is not required by any class, nor do students receive academic credit for participating in Senior Executive Council. 3/18/03 Tr. at 162:19–163:4 (King); 317:8–12; 319:13–320:4; 321:5–6 (Johnson). Defendants have presented no evidence that Senior Executive Council is related to the curriculum as a whole, and the evidence shows that Senior Executive Council activities are not related to the curriculum as a whole. PX 30, 31.

*Beta Club*

53. Beta Club is a community service honor group for students who have at least a 3.5 grade point average and who complete a certain number of community service credits each year. After completing their required community service credits, seniors in Beta Club receive a stole that says "Beta" on it. At the end of the Spring 2003 semester, seniors will be permitted to wear their Beta stoles at graduation to signify that they have been so honored. 3/18/03 Tr. at 104:2–21, 121:6–9 (Alcorn); 3/19/03 Tr. at 145:15–146:13 (Thornbury).

54. Since December 20, 2002, Defendants have allowed the Beta Club to use the intercom and to meet during home room with their faculty sponsor, Mrs. Thornbury. 3/18/03 Tr. at 262:13–263:7; 265:15–20 (Carter); McClelland Decl. at ¶ 9. Students have also been told that they can complete their Beta community service

requirements at East Campus, a separate set of buildings directly across the street from the main BCHS campus where most of the vocational courses are taught. 3/18/03 Tr. at 104:14–105:13 (Alcorn).

55. Courses offered at the main BCHS campus and at the Career Technical Education Center on East Campus are part of an integrated curriculum, and BCHS students who take classes at East Campus receive credit on their BCHS transcripts. Joint Stip. ¶ 20; 3/18/03 Tr. at 108:6–14 (Alcorn); 3/19/03 Tr. at 82:4–11 (Tackett).

56. Community service, Beta Club's only substantial activity, is not actually taught and will not soon be taught in any regularly offered course at BCHS. Participation in Beta Club is not required for any course and does not result in academic credit. 3/18/03 Tr. at 105:19–106:6 (Alcorn), 161:13–22 (King); 317:8–12; 319:17–18; 320:19–21; 321:17–19 (Johnson); 3/19/03 Tr. at 145:18–25 (Thornbury).

## III. ANALYSIS

This case is presently before the Court on Plaintiffs' motion for preliminary injunction. When presented with a motion for preliminary injunction, the district court should consider four factors: (1) whether the moving party has a strong likelihood of success on the merits; (2) whether the moving party will suffer irreparable injury without the injunction; (3) whether the issuance of the injunction would cause substantial harm to others; and (4) whether the issuance of the injunction would serve the public interest. *National Hockey League Players' Ass'n v. Plymouth Whalers Hockey Club*, 325 F.3d. 712, 717 (6th Cir.2003). The four considerations applicable to preliminary injunction decisions are factors to be balanced, not prerequisites that must be met. *Id.* Moreover, a district court is not required to make specific findings concerning each of

the four factors used in determining a motion for preliminary injunction if fewer factors are determinative of the issue. *Id.*

## A. *Plaintiffs' Likelihood of Success on the Merits*

Plaintiffs assert claims for violation of the Equal Access Act, First Amendment rights of expression and association, and KERA. Reviewing the likelihood of Plaintiffs' success on the merits first necessitates a review of the law applicable to the claims raised.

### 1. *Equal Access Act*

#### a. *History and Overview of the Act*

In view of the paucity of Sixth Circuit case law interpreting the federal Equal Access Act ("EAA"), 20 U.S.C. § 4071, *et seq.*, an understanding of why and how the law came into being is helpful in understanding its operation and whether it has been violated in this case.

In 1984, Congress passed the EAA to both guarantee and protect the rights of public high school students. The EAA was passed by wide, bipartisan majorities in both chambers of Congress. Its purpose was to counteract perceived discrimination against content-based religious speech in public high schools, while balancing the Establishment Clause interests at stake. *See Board of Educ. of Westside Community Schools v. Mergens,* 496 U.S. 226, 239, 110 S.Ct. 2356, 110 L.Ed.2d 191 (1990). The legislative history also shows that the EAA was enacted in part in response to two federal appellate court decisions [5] which had held that student religious groups could not, consistent with the Establishment Clause, meet on school premises during noninstructional time. *Id.; see also* H.R.Rep. No. 98-710; S.Rep.

No. 98-357. The constitutionality of the EAA was upheld by the U.S. Supreme Court in *Mergens.*

Under the EAA, if a public school which receives federal financial assistance has created a limited open forum, it is unlawful for that school to deny equal access to, or a fair opportunity to, or to discriminate against, any students who wish to conduct a meeting within such limited open forum on the basis of the religious, political, philosophical, or other content of the speech at such meetings. 20 U.S.C. § 4071(a). A public secondary school has a "limited open forum" whenever it grants an offering to, or opportunity for, one or more noncurriculum-related student groups to meet on school premises during noninstructional time. 20 U.S.C. § 4071(b).

The Court recognizes that "the education of the Nation's youth is primarily the responsibility of parents, teachers, and state and local school officials, and not of federal judges." *Hazelwood School District v. Kuhlmeier,* 484 U.S. 260, 273, 108 S.Ct. 562, 98 L.Ed.2d 592 (1988). While the daily operation of school systems is traditionally reserved to the states and local school boards, by enacting the EAA Congress "made a matter once left to the discretion of local school officials the subject of comprehensive regulation by federal law." *Mergens,* 496 U.S. at 259, 110 S.Ct. 2356.

Despite the mandates of the EAA, school districts retain significant discretion and authority over the type of activities, groups, and/or clubs in which students will be permitted to participate during noninstructional time. *Id.* at 240, 110 S.Ct. 2356. School districts retain the authority and latitude to establish their own courses

---

5. *Lubbock Civil Liberties Union v. Lubbock Independent School Dist.,* 669 F.2d 1038, 1042–48 (5th Cir.1982), *cert. denied,* 459 U.S. at 1155–56, 103 S.Ct. 800, 74 L.Ed.2d 1003 (1983), and *Brandon v. Guilderland Board of Education,* 635 F.2d 971 (2nd Cir.1980), *cert. denied,* 454 U.S. 1123, 102 S.Ct. 970, 71 L.Ed.2d 109 (1981).

and curriculum. In the exercise of that discretion, schools may structure their course offerings in such a way as to avoid application of the EAA. For instance, so long as the activities, groups, and/or clubs meeting at the school directly relate to the curriculum taught in those courses, the school district has not created a limited open forum and so the EAA has not been violated. *Id.*

Even in those circumstances where a limited open forum has been created, the EAA does not limit a school's authority to prohibit meetings that would "materially and substantially interfere with the orderly conduct of educational activities *within the school.*" (emphasis added) *Id.*; 20 U.S.C. § 4071(c)(4). The EAA further preserves "the authority of the school, its agents and employees, to maintain order and discipline on school premises, to protect the well-being of students and faculty, and to assure that attendance of students at meetings is voluntary." 20 U.S.C. § 4071(f).

Finally, the EAA applies only to public secondary schools which receive federal funding. 20 U.S.C. § 4071(a). Therefore, a school district seeking to avoid the obligations of the statute could simply choose to forego federal funding. Although that option is ordinarily unrealistic to most, if not all, local school districts, by passing the EAA Congress clearly "sought to prohibit schools from discriminating on the basis of the content of a student group's speech, and that obligation is the price a federally funded school must pay if it opens its facilities to noncurriculum related student groups." *Mergens,* 496 U.S. at 240, 110 S.Ct. 2356.

### b. *Review of Case Law Interpreting and Applying the EAA; Mergens and its Progeny*

In *Mergens,* the Supreme Court examined whether three student groups (Sub-surfers, Chess, and Peer Advocates) were sufficiently related to the curriculum that a limited open forum was therefore not created. The Court rejected the school district's efforts to relate Subsurfers (scuba diving) to physical education and to relate Chess to math because neither chess nor scuba diving were "taught in any regularly offered course at the school" nor did either "result in extra academic credit." 496 U.S. at 245, 110 S.Ct. 2356. Likewise, a special education service group, known as Peer Advocates, was not required by "any courses offered by the school," did not figure as part of a required participation for any course, and did "not result in extra credit in any course." *Id.* at 246, 110 S.Ct. 2356. Efforts by school officials to link Subsurfers to swimming which was taught as part of physical education and to link Chess to math based on encouragement by math teachers to play the game were specifically rejected by the Court. The Court explained that curriculum related must mean something other than being "remotely related to abstract educational goals;" otherwise, "no schools [would have] limited fora … and schools could evade the Act by strategically describing existing student groups." *Id.* at 244, 110 S.Ct. 2356. "The logic of the EAA also supports [the] view … that a curriculum-related student group is one that has more than just a tangential or attenuated relationship to courses offered by the school." *Id.* at 238, 110 S.Ct. 2356. Because Congress intended a "low threshold for triggering the Act's requirements," the term "noncurriculum related student group" is to be "interpreted *broadly* to mean any student group that does not *directly* relate to the body of courses offered by the school." *Mergens,* 496 U.S. at 239–40, 110 S.Ct. 2356 (emphasis added).

Because Congress did not expressly define "noncurricular" when it enacted the EAA, the Supreme Court in *Mergens* spent considerable time discussing the fac-

tors lower courts should use in deciding whether a group is "noncurricular," thereby creating a "limited open forum" that, in turn, triggers the obligations of the EAA. The Supreme Court provided guidance to determining what constitutes a "noncurriculum related student group" by setting forth the criteria for what constitutes a "curriculum related student group." According to *Mergens*, a student group directly relates to a school's curriculum if:

(1) the subject matter of the group is actually taught, or will soon be taught, in a regularly-offered course;

(2) the subject matter of the group concerns the body of courses as a whole;

(3) participation in the group is required for a particular course; or

(4) participation in the group results in academic credit.

496 U.S. at 239–40, 110 S.Ct. 2356. "Whether a specific student group is a 'noncurriculum related student group' will therefore depend on a particular school's curriculum, but such determinations would be subject to factual findings well within the competence of trial courts to make." *Id.* at 240, 110 S.Ct. 2356. Moreover, in determining whether a student group is curricular versus noncurricular, the Court favored a substance over form analysis, stating that the proper inquiry is for trial courts to look at a school's actual practice rather than its stated policy. *Id.* at 246, 110 S.Ct. 2356.

Numerous federal courts since *Mergens* have adopted the same narrow interpretation of curriculum relatedness when addressing access by student religious groups to school facilities. For example, in *Pope v. East Brunswick Board of Edu-*

*cation,* 12 F.3d 1244 (3d Cir.1993), the Third Circuit held that the school board created a limited open forum under the EAA by permitting the Key Club, a national service organization associated with Kiwanis, to meet during noninstructional time. Prior to the complaint being filed, the school board attempted to remove the high school from the reach of the EAA by restructuring and eliminating student groups. *Id.* at 1247. The school board argued that the Key Club was related to the school's History and Humanities classes, which taught a unit on homelessness, hunger, and poverty.[6]

In rejecting the school board's claim, the Third Circuit concluded that retention of the Key Club was sufficiently noncurriculum related that a limited open forum was created, bringing the school within the EAA and thereby requiring it to permit a Bible club to have access to its facilities, the public address system, and bulletin boards. *Pope*, 12 F.3d at 1252. The Third Circuit reasoned that, in order for a school to make a curriculum-related connection between a student group and a course being taught at the school, "the curriculum-relatedness of a student activity must be determined by reference to the primary focus of the activity measured against the significant topics taught in the course that assuredly relates to the group." *Id.* at 1253.

Just as the Supreme Court had done in *Mergens*, the Third Circuit in *Pope* held that the EAA is triggered by what a school does, not what it says. While a school certainly has the right to maintain a closed forum to avoid the dictates of the EAA, it does so at its own peril,[7] running the risk

---

**6.** The evidence showed that the East Brunswick High School Key Club's activities included a variety of fund-raising activities, the proceeds of which were donated to charity. 12 F.3d at 1252.

**7.** Justice Anthony Kennedy, in his concurring opinion in *Mergens*, recognized this Hobson's choice when he stated that "one of the consequences of the [EAA], as we now interpret it, is that clubs of a most controversial character might have access to the student life of high

that one or more of its groups will be determined to be a "noncurriculum-related group."

■ Once a court determines, using the factors outlined above, that even one "non-curriculum-related student group" has been permitted to meet, a limited open forum has been created and the EAA's obligations are triggered. The school may not deny other clubs, on the "basis of the content of their speech, equal access to meet on school premises during noninstructional time." *Mergens*, 496 U.S. at 236, 110 S.Ct. 2356; *Colin v. Orange Unified School Dist.*, 83 F.Supp.2d 1135, 1145–46 (C.D.Cal.2000) ("Once a school recognizes any such group, it has created a 'limited open forum' and the school is prohibited 'from denying equal access to *any* other student group on the basis of the content of that group's speech.'") (quoting *Mergens*, 496 U.S. at 240, 110 S.Ct. 2356). Thus, in the *Pope v. East Brunswick Board of Education* case discussed above, despite the school board's efforts to avoid the requirements of the EAA by seeking to establish a forum limited to curriculum-related groups only (a closed forum), the school board in *Pope* had not gone far enough. For that reason, the Third Circuit held that the school violated the EAA when it denied equal access to the student Bible Club.

In *Garnett v. Renton School District,* the district court determined that Future Business Leaders of America (FBLA) was a noncurriculum-related student group meeting at the school and, therefore, the school's refusal to also permit a Bible Club to meet during noninstructional time violated the EAA.[8] *Garnett v. Renton School Dist.,* 772 F.Supp. 531, 534 (W.D.Wash. 1991), *rev'd on other grounds,* 987 F.2d 641 (9th Cir.1993), *cert. denied,* 510 U.S. 819, 114 S.Ct. 72, 126 L.Ed.2d 41 (1993), *on remand,* 1994 WL 555397 (W.D.Wash. 1994), *appeal after remand,* 21 F.3d 1113, 1994 WL 134272 (9th Cir.1994) (Table, Text in Westlaw).[9] School district and state guidelines required that FBLA be offered, but business class students were not required to attend and no academic credit was awarded for participation. The court stated that in such a circumstance where a club such as FBLA is required to be offered, the options open to a school to avoid a limited open forum under the EAA are restricted: "adjust class requirements, provide instruction in FBLA meetings, or drop business classes." 772 F.Supp. at 534.

What constitutes the statutory "equal access" required by the EAA is also worth noting. Equal access "to meet" is broadly defined under the EAA to include all activities in which student groups are permitted

schools that in the past have given official recognition only to clubs of a more conventional kind." 496 U.S. at 259, 110 S.Ct. 2356 (Kennedy, J., concurring).

8. FBLA was only 1 of 11 student clubs that the district court found were noncurriculum related. The other clubs were: Pep Club, Chess Club, Girl's Club, Ski Club, Bowling Club, SKY (Special Kiwanis Youth) Club, International Club, Varsity Club, Minority Student Union, Dance Squad. *Garnett*, 772 F.Supp. at 534.

9. Although the district court originally found that FBLA was a noncurricular club, it none-

theless held that the EAA was not applicable for purposes of requiring a Bible Club to meet on school premises because such a requirement would violate the Washington state constitution. Eventually the Ninth Circuit, after the case had been remanded on appeal from the Supreme Court in the wake of *Mergens,* held that the EAA preempted the state constitution and, therefore, the Bible Club would have to be permitted to meet since the school created a limited open forum. On remand, the district court issued declaratory and injunctive relief on behalf of students seeking to meet for religious purposes on school premises.

to engage in a particular school. *See* 20 U.S.C. § 4072(3); *Mergens,* 496 U.S. at 237, 247, 110 S.Ct. 2356 (requiring equal access to official recognition as a school club including access to school newspaper, bulletin boards, public address system and Club Fair); *Prince v. Jacoby,* 303 F.3d 1074, 1086 (9th Cir.2002) (requiring equal access to loudspeaker and use of bulletin boards). Thus, once a court determines that a limited open forum has been created because school access has been provided to at least one noncurriculum-related group, the access afforded must be equal to that provided to all groups, both curricular and noncurricular.

### c. *Review of Case Law Involving GSA Organizations Specifically*

Although the majority of cases defining and interpreting the EAA involve requests by religious groups to meet on school property during noninstructional time, several district courts have specifically addressed the more contentious issue of permitting gay rights groups to meet during noninstructional time. For example, in *Colin v. Orange Unified School Dist.,* 83 F.Supp.2d 1135 (C.D.Cal.2000), the court was asked to determine whether a student "Gay–Straight Alliance" club seeking recognition by the public high school for purposes of access to school premises for meetings was a "noncurriculum-elated" group under the Equal Access Act. The school district argued that the GSA related to human sexuality, which was taught in Health, Biology, and Family Planning courses, since the club intended to discuss issues related to tolerance, respect, sexual orientation, and homophobia. 83 F.Supp.2d at 1139–40. Following the four-step analysis of *Mergens,* the court found that, even if there was some overlap between what the plaintiffs wished to discuss and what was taught in the sex education curriculum, that overlap was not a sufficient nexus to the regularly-offered sex education curriculum to cause the club to be curriculum related and remove it from the protection of the Equal Access Act.

The Court specifically found that the school district had maintained a limited open forum in word and deed because several other noncurriculum-related groups had been recognized by the school district. *Id.* at 1143–47. These noncurriculum-related groups included a Christian Club and Red Cross/Key Club. Since the defendant had maintained a limited open forum, and because the club met other requirements of the Act,[10] the court ruled that the GSA Club had been denied access to the school's limited open forum, holding this denial is "exactly the type of content-based restriction that is forbidden by the Equal Access Act." *Id.* at 1147. The court granted the injunction, ordering the school district to provide equal access to the GSA Club.

In *East High Gay/Straight Alliance v. Board of Education of Salt Lake City School Dist.,* a GSA club was granted injunctive relief, thereby permitting it to meet at the defendant high school. *East*

---

**10.** Consistent with the plain language of the statute, the court found that the only meetings the schools subject to the EAA could prohibit were those that "materially and substantially interfered with the orderly conduct of educational activities within the school." 20 U.S.C. § 4071(c)(4). In *Colin,* the court found that the school district failed to show that the GSA meetings would have such an effect, stating: "the Board will not likely be able to show that groups of students discussing homophobia and acceptance of all students regardless of sexual orientation somehow serves as a major disruption to the education students. Indeed, this [GSA] club is actually being formed to avoid the disruptions to education that can take place when students are harassed based on sexual orientation." *Colin,* 83 F.Supp.2d at 1146.

*High Gay/Straight Alliance v. Board of Education of Salt Lake City School Dist.,* 81 F.Supp.2d 1166, 1184 (D.Utah 1999). In *East High,* the school district had a policy of allowing school access only to curriculum-related student groups, which policy specifically stated that it was defendant's intent not to create a limited open forum for Equal Access Act purposes. Plaintiffs, who wished to form a support group for homosexual students, argued they had been denied equal access to the defendant's facilities, including the public address system, bulletin boards, and the school fair. They asserted that regardless of the school district's policy, in actual practice the defendant had provided access to noncurriculum-related as well as curriculum-related student groups. Plaintiffs filed suit pursuant to, *inter alia,* the Equal Access Act, seeking declaratory and injunctive relief and nominal damages.

The plaintiffs in *East High* argued that five student groups, Improvement Council of East ("ICE"), Future Homemakers of America, Future Business Leaders of America, National Honor Society, and Odyssey of the Mind, were noncurriculum related. The stated purpose of ICE was to create a caring, positive school environment. *Id.* at 1174. Applying the *Mergens* test, the Court found only one student group, ICE, to be noncurriculum related because this group's activities could not be tied to the subject matter of any course, did not relate to the body of courses, and no academic credit was given. The court found the school district had thereby created a limited open forum and, consequently, by denying the plaintiffs access, violated the Equal Access Act. Plaintiffs' motion for partial summary judgment was granted. *Id.* at 1198.[11]

It is against this backdrop of the EAA, and the Court being mindful of the decisions applying and interpreting it, that we turn to the controversy at hand.

### d. *Application of the EAA to the Facts Herein*

In that regard, the Court must first determine if any of the groups which the Court has found to be meeting during noninstructional time since December 20, 2002 (*see* Statement of the Facts, *supra,* ¶¶ 40–56) are noncurricular. If Defendants have permitted *any* noncurriculum-related student group to meet at BCHS during noninstructional time since December 20, 2002, then they must allow *every* student group, whether curriculum related or noncurriculum related, to meet on the same terms. *Mergens,* 496 U.S. at 240, 110 S.Ct. 2356; *Student Coalition for Peace v. Lower Merion School Dist.,* 776 F.2d 431, 442 (3d Cir.1985).

### *Bible Club*

■ Defendants have already identified the Bible Club/Christian Fellowship Club as noncurricular (PX 2, last page). Defendants seek to distinguish the Bible Club, despite conceding its noncurricular status, by contending that school administrators were unaware that members of the Bible Club had been meeting on a regular basis in the hallway before home room. Notably, however, Defendants did not elicit clear testimony that school administrators did not know about the Bible Club meetings. *See supra* at ¶ 46. Regardless of Defendants' purported lack of knowledge of these meetings, the Equal Access Act does not permit schools to use their lack of knowledge as a defense. As set forth in 20 U.S.C. § 4071(b), "a public secondary school has a limited open forum whenever such school *grants an offering to or oppor-*

---

11. However, the *East High* court held that the school district's limited open forum was terminated after the end of the 1997–98 school year, and at that point the violation of "gay-positive" group's rights under the EAA ceased.

*tunity for* one or more non-curriculum related student group to meet on school premises during noninstructional time." (emphasis added). By opening their doors to students prior to school, the BCHS gave Bible Club students the opportunity to meet. This is all that is required by the statute. Given the conspicuous location and number of the meetings, the Court finds Defendants either knew or should have known the meetings were occurring.

Defendants' purported lack of knowledge of these Bible Club meetings does not negate a finding that a limited open forum exists at BCHS. Any other result would be inconsistent with the Supreme Court's decision in *Mergens* to interpret noncurricular clubs broadly and would frustrate the policies behind the Equal Access Act. The Court will not condone an interpretation of the language of the EAA that allows school officials to deny equal access to student groups that comply with administration rules by burying their heads in the sand and wilfully ignoring student groups, such as the Bible Club, which flagrantly violate those rules.

■ School officials "grant" an offering or opportunity to a student group when they know or should know the group is violating administration rules but take no action to prevent further meetings. The Court concludes that the Bible Club is a noncurriculum-related student group.

### Drama Club

■ The factual findings relating to this student organization can be found herein at ¶¶ 40–44. Although perhaps not meeting as the "Drama Club" per se, a group of students has met frequently in the BCHS auditorium after school to rehearse for a play that will be performed at school, 3/18/03 Tr. at 49:5–14 (McClelland);

108:15–24 (Alcorn); 195:12–18 (King); 317:8–18 (Johnson); 3/19/03 Tr. at 100:17–101:7 (Hutchinson), has used the intercom during home room to call participating students to meetings related to play practice, 3/18/03 Tr. at 118:9–14 (Alcorn); 177:15–19 (King), and has listed the names of people in the drama group on a bulletin board in the hallway outside Ms. Thornbury's classroom. Alcorn Decl. at ¶ 7.

BCHS is currently offering an Arts & Humanities class in the Spring 2003 semester, which includes a section on theater history. However, acting is not one of the primary objectives of the class. In the theater history section of the Arts & Humanities class, students are taught about costumes in early French theater, about Greek and Roman mythology and about vocabulary words relevant to the theater. Students also spend approximately one and a half days on oral presentations in which students read a story aloud and tell a story from their own personal experience. The theater section of Arts & Humanities does not actually teach students acting or any of the other skills students would need to put on a play. 3/18/03 Tr. at 109:6–110:8 (Alcorn); 158:5–23 (King).

A close review of BCHS's 2002–03 curriculum guide reveals that the Arts and Humanities Class does include a section on drama.[12] (PX 30 at p. 21) However, participation in the student group practicing to perform a play is not required by the Arts and Humanities Class and does not result in academic credit, despite the fact that teachers have the option of requiring their students to *watch* a performance of the play during instructional time, and may assign course work based on discussion questions provided to students who *watch* the play. 3/18/03 Tr. at 50:12–20 (McClelland); 108:25–109:5 (Alcorn); 317:8–12;

---

**12.** The Arts and Humanities Class "is divided into four sections—visual arts/art history, dance, music, and *drama.*" (emphasis added).

319:17–24 321:1–2; 320:19–321:2; 322:1–3 (Johnson); 3/19/03 Tr. at 100:17–103:4, 113:20–22 (Hutchinson).

Moreover, despite the fact that drama is listed as being taught in the Arts and Humanities Class, the subject matter of the drama group is not actually taught and will not soon be taught in any regularly offered course at BCHS. 3/18/03 Tr. at 320:14–321:2 (Johnson). Additionally, although the BCHS Curriculum Guide lists a Speech/Drama course (PX at p. 31), that course was not offered in the 2001–02 academic year and is not being offered for the 2002–03 academic year, nor does BCHS have any plans to teach Speech/Drama next year. 3/18/03 Tr. at 49:21–50:11 (McClelland); 3/19/03 Tr. at 99:20–25 (Hutchinson); PX 30 at 31.

Interpreting the term "noncurriculum-related student group" broadly, as is required by *Mergens,* the court concludes that the Drama Club is a noncurriculum-related student group.

### Executive Councils

■ In view of the facts found herein at ¶¶ 48–52, the Court concludes that both Junior and Senior Executive Councils are noncurriculum-related student groups. In *Mergens,* the Supreme Court held that student government relates directly to curriculum only "to the extent that it addresses concerns, solicits opinions, and formulates proposals pertaining to the body of courses offered by the school" and does not relate directly to curriculum merely because it provides an understanding of government processes. *Mergens,* 496 U.S. at 240, 244, 110 S.Ct. 2356.

The stated purpose of these councils was prom preparation and selection and organization of class rings (Junior Executive Council) and planning the senior trip, talent show, and senior t-shirts (Senior Executive Council). Following the *Mergens*

framework, none of these stated purposes is even remotely related to curriculum. As a result, Junior and Senior Executive Council are noncurriculum-related student groups.

### Beta Club

■ Although the facts relating to Beta Club *meetings* since December 20, 2002, is somewhat less than those establishing Bible Club meetings since that same date, it is clear that as a matter of law, the use of the BCHS intercom system to make Beta Club announcements triggers the application of the EAA.[13] *See Mergens,* 496 U.S. at 247, 110 S.Ct. 2356 (equal access includes bulletin boards, school newspaper, and public address system); *Prince v. Jacoby,* 303 F.3d 1074, 1086 (9th Cir.2002) (same).

As a community service club, the activities of Beta Club are not actually taught and will not soon be taught in any regularly offered course at BCHS. Participation in Beta Club is neither required for any course, nor does it result in academic credit. 3/18/03 Tr. at 105:19–106:6 (Alcorn), 161:13–22 (King); 317:8–12; 319:17–18; 320:19–21; 321:17–19 (Johnson); 3/19/03 Tr. at 145:18–25 (Thornbury).

At least two other courts, including the Supreme Court, found community service-based clubs, similar to the BCHS Beta Club, were noncurricular. *See Mergens,* 496 U.S. at 240, 246, 110 S.Ct. 2356 (listing community service club as example of "non-curriculum related student group"); *Pope,* 12 F.3d at 1251, 1254 (Key Club is noncurricular).

There are, therefore, four noncurriculum-related student groups at BCHS. As a result of these findings, the Court concludes that Defendants, despite their attempts to close the forum with their December 20, 2002 action, have allowed and are continuing to allow numerous student

---

**13.** See Facts at ¶ 54.

activities, both curricular and noncurricular, to meet at school during noninstructional time, to use the public address system, and to publish information about their activities in the school newspaper paper. Accordingly, the Court finds that Defendants are maintaining a "limited open forum" by allowing at least one noncurriculum-related student group to meet at the BCHS during noninstructional time. 20 U.S.C. § 4071(b).[14]

Thus, having found that the Defendants are subject to the EAA by virtue of permitting at least one noncurriculum-related group to meet or use the facilities at BCHS, in order to properly exclude the GSA from having equal access as required by the EAA, Defendants must show that the GSA Club will "materially and substantially interfere with the orderly conduct of educational opportunities within the school," 20 U.S.C. § 4071(c)(4), or will limit the school's ability "to maintain order and discipline on school premises, to protect the well-being of students and faculty...." 20 U.S.C. § 4071(f).

**e. *Allowing the GSA to meet or have equal access to BCHS's facilities will neither materially or substantially interfere with the orderly conduct of educational activities within BCHS, limit BCHS's ability to maintain order and discipline on school premises, nor limit BCHS's ability to protect the well-being of its students or faculty.***

In this case, it is obvious that the proposed creation of a GSA Club at BCHS has caused some level of uproar within the local community. *See* Statement of Facts, *supra* at ¶¶ 18–19, 27. It is equally apparent that several school administrators and board members received numerous complaints and questions from parents who were concerned about the approval of the GSA Club and how that approval might affect the safety of their children. *Id.* at ¶ 28. Additionally, there were two student protests regarding the approval of the GSA Club, one on October 30, 2002, and the other on November 4, 2002. *Id.* at ¶¶ 22–26. In short, the disruption to which Defendants were responding when they voted to ban all clubs was caused by GSA opponents, not GSA Club members themselves. *Id.* at 33.

Although there is a relative paucity of case law interpreting what level of disruption is necessary before a school, subject to the obligations of the EAA can deny equal access without violating the Act, a review of what little case law does exist is helpful. The leading case on attempts to suppress speech within the high school setting is *Tinker v. Des Moines Independent Community School Dist.*, 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969).

It is axiomatic that students do not shed their First Amendment rights at the schoolhouse gate. *Id.* at 509, 89 S.Ct. 733. In *Tinker*, the Supreme Court verified the rights of junior high and high school students to engage in nondisruptive expression on school premises, in particular the wearing of black armbands to protest the Vietnam War. The Des Moines school ad-

14. In view of the Court's conclusions that Bible Club, Drama Club, Beta Club, and Executive Councils are each noncurriculum-related groups, the Court need not determine whether the following groups/clubs are noncurriculum-related under *Mergens:* Mock Trial, KUNA/Model UN, athletic teams/cheerleaders, HOSA, Teen Court, Student Council, FBLA, FCCLA, FFA, and 4–H, academic teams. Significant testimony regarding the curriculum relatedness of many of these groups has been offered, but because only one noncurriculum-related group is required to create a limited open forum under *Mergens*, and this has now been evidenced, the Court need not analyze the curriculum-relatedness of these remaining organizations.

ministrators had suspended three students for wearing the armbands because they feared a disturbance would otherwise result. The United States Supreme Court disagreed and delimited the school officials' authority to restrict student expression only where such expression would "materially and substantially interfere with the requirements of appropriate discipline in the operation of the school." *Id.* The statutory language of 20 U.S.C. § 4071(f) was taken directly from *Tinker.* See *Hsu v. Roslyn Union Free School Dist. No. 3,* 85 F.3d 839, 868, n. 28 (2nd Cir.1996) (concluding 20 U.S.C. § 4071(f) incorporated *Tinker* rule).

In *Tinker,* the Supreme Court concluded that school officials violated the First Amendment when they prohibited students from wearing black armbands to protest the Vietnam War. *Tinker,* 393 U.S. at 514, 89 S.Ct. 733. The Court rejected arguments that the students could be punished for wearing their armbands because school authorities had an "urgent wish to avoid the controversy which might result from the expression," *id.* at 510, 89 S.Ct. 733, because other students made hostile remarks to the children wearing armbands, *id.* at 508, 89 S.Ct. 733, because students argued in class about the armbands instead of paying attention, *id.* at 518, 89 S.Ct. 733, (Black, J., dissenting), or because responses to the armbands might lead other students to start an argument or cause a disturbance, *id.* at 508, 89 S.Ct. 733.

Refusing to allow a "heckler's veto" to justify suppression of student speech, the Court in *Tinker* was careful to focus on whether *"engaging in the forbidden conduct* would materially and substantially interfere with the requirements of appropriate discipline," *id.* at 538, 89 S.Ct. 733 (emphasis added), and concluded that the protesting students' speech was protected because it was "entirely divorced from ac-

tually or potentially disruptive conduct *by those participating in it."* *Id.* at 505–06, 89 S.Ct. 733 (emphasis added). *Tinker* expressly relied on the leading heckler's veto case, *Terminiello v. Chicago,* 337 U.S. 1, 69 S.Ct. 894, 93 L.Ed. 1131 (1949). The Court explained that:

> [a]ny departure from the majority's opinion may inspire fear. Any word spoken, in class, in the lunchroom, or on the campus, that deviates from the views of another person may start an argument or cause a disturbance. But our Constitution says we must take this risk, *Terminiello v. Chicago,* 337 U.S. 1, 69 S.Ct. 894, 93 L.Ed. 1131 (1949), and our history says that it is this sort of hazardous freedom—this kind of openness— that is the basis of our national strength and of the independence and vigor of Americans who grow up and live in this relatively permissive, often disputatious, society.

*Tinker,* 393 U.S. at 509, 89 S.Ct. 733.

In *Terminiello,* the Court held that officials violated the First Amendment when they arrested a speaker for disorderly conduct because of the disruption caused by others in response to his message. *Terminiello v. Chicago,* 337 U.S. at 4, 69 S.Ct. 894. The Supreme Court held that the First Amendment prohibits the government from punishing a speaker merely because his speech "stir[s] people to anger, invite[s] public dispute, or [brings] about a condition of unrest." *Id.* at 5, 69 S.Ct. 894; *see also U.S. v. Eichman,* 496 U.S. 310, 318, 110 S.Ct. 2404, 110 L.Ed.2d 287 (1990) ("any suggestion that the Government's interest in suppressing speech becomes more weighty as popular opposition to that speech grows is foreign to the First Amendment"). Despite disruption and violence in response to Terminiello's speech, the Supreme Court stated:

> a function of free speech under our system of government is to invite dispute.

It may indeed best serve its high purpose when it induces a condition of unrest, creates dissatisfaction with conditions as they are, or even stirs people to anger. Speech is often provocative and challenging. It may strike at prejudices and preconceptions and have profound unsettling effects as it presses for acceptance of an idea. That is why freedom of speech, though not absolute, is nevertheless protected against censorship or punishment, unless shown likely to produce a clear and present danger of a serious substantive evil that rises far above public inconvenience, annoyance or unrest. There is no room under our Constitution for a more restrictive view. For the alternative would lead to standardization of ideas either by legislatures, courts, or dominant political or community groups.

*Id.* at 4–5, 69 S.Ct. 894 (citations omitted).

■ Incorporation of the *Tinker* rule into 20 U.S.C. § 4071(f) means that a school may not deny equal access to a student group because student and community opposition to the group substantially interferes with the school's ability to maintain order and discipline, even though equal access is not required if the student group itself substantially interferes with the school's ability to maintain order and discipline. *Tinker,* 393 U.S. at 505–06, 509, 538, 89 S.Ct. 733. Consistent with the holdings of *Tinker* and *Terminiello,* the Equal Access Act permits Defendants to prohibit Plaintiffs from meeting on equal terms with the noncurriculum-related student groups that have been permitted to meet since December 20, 2002 only upon a showing that Plaintiffs' *own* disruptive activities have interfered with Defendants ability to maintain order and discipline. 20 U.S.C. § 4071(f); *Tinker,* 393 U.S. at 505–06, 509, 89 S.Ct. 733. As addressed herein, Defendants have made no such showing in this case.

■ Assuming *arguendo* that the anti-GSA faction at BCHS was sufficiently disruptive to "materially and substantially interfere with the requirements of appropriate discipline," Defendants are not permitted to restrict Plaintiffs' speech and association as a means of preventing disruptive responses to it. *Tinker,* 393 U.S. at 509, 89 S.Ct. 733. The Court further finds that the "heckler's veto" rule does not limit Defendants' authority to maintain order and discipline on school premises or to protect the well-being of students and faculty. There was no proof elicited during the hearing that, if the GSA Club were provided equal access, Defendants' ability to discipline any student who is disruptive would be diminished in any way. *Tinker* and *Terminiello* are designed to prevent Defendants from punishing students who express unpopular views instead of punishing the students who react to those views in a disruptive manner.

*Gernetzke v. Kenosha Unified School Dist.,* 274 F.3d 464 (7th Cir.2001), cited by Defendants, is distinguishable from this case. In *Gernetzke,* students sought to dictate the message to be included in school sponsored speech—a mural on the school's wall. The school principal forbade the inclusion of a large cross on the club's mural because he was afraid that it might invite a lawsuit and incite ugly conflicts among the students. The Seventh Circuit found that the school principal's decision to forbid the display of the cross in a mural painted by the school bible club was insulated from liability under Equal Access Act.

*Gernetzke* is easily distinguished because students are particularly likely to presume that murals on the school walls convey messages endorsed by the school. The GSA's message in the case *sub judice* is clearly not school sponsored. School-

sponsored speech is governed by *Hazelwood School Dist. v. Kuhlmeier*, 484 U.S. 260, 108 S.Ct. 562, 98 L.Ed.2d 592 (1988), rather than by *Tinker*.

While Defendants argue that these protests and the public uproar surrounding the GSA Club have materially and substantially interfered with the orderly conduct of educational activities at BCHS, limited their authority to maintain order and discipline, and limited their ability to protect the well-being of students and faculty, the facts simply do not support such a conclusion.[15] Other than one incident (*see* Statement of Facts at ¶ 29), there have been no documented instances of disruptions caused by GSA members or GSA supporters. *Id.* Additionally, there was no evidence presented during the hearing that either GSA members or GSA Club meetings were disruptive. *Id.*

The evidence presented during the hearing reveals that despite these protests, school officials did an excellent job maintaining the educational environment at BCHS. For instance, regularly scheduled classroom activities were not altered in any way, teachers were not prevented from teaching, and students who attended school were not prevented from learning. 3/19/03 Tr. at 205:13–20 (Cyrus); 243:12–19 (Capehart); Tr. at 13:3–18 (Fugett) (despite anti-gay epithets used by anti-GSA students during Mrs. Weinfurtner's

French class, Mrs. Weinfurtner was still able to teach French) (sealed); 3/18/03 Tr. at 83:24–84:14 (McClelland); 131:17–132:9 (Alcorn); 210:4–7 (Fugett); Statement of Facts at ¶ 26.

As the district court stated in *Colin, supra:*

> The Board Members may be uncomfortable about students discussing sexual orientation and how all students need to accept each other, whether gay or straight. As in *Tinker*, however, when the school administration was uncomfortable with students wearing symbols of protest against the Vietnam War, Defendants cannot censor the students' speech to avoid discussions on campus that cause them discomfort or represent an unpopular viewpoint.

83 F.Supp.2d at 1149.

For these reasons, the Court finds that Plaintiffs have shown a strong likelihood of succeeding on their claim that Defendants violated their rights under the Equal Access Act.

### 2. *First Amendment & KERA Claims*

Since the Court has found that Defendants likely violated the Equal Access Act, the Court need not at this time address either Plaintiffs' First Amendment claim or KERA claim for purposes of the pending motion.[16]

---

**15.** In their brief, Defendants argue that in view of their CATS Assistance Level II, they were justified in taking all appropriate steps to improve their CATS level, including banning all clubs. While the Court applauds Defendants' efforts to improve the educational environment at BCHS, which includes higher CATS scores, the EAA applies to all public high schools that accept federal funding and have created a limited open forum. The EAA applies to all schools which meet the statutory definition, not just the highly performing schools which meet that same definition.

**16.** The Supreme Court has continually suggested that lower courts should avoid reaching constitutional questions where possible. *See United States v. National Treasury Employees Union*, 513 U.S. 454, 478, 115 S.Ct. 1003, 130 L.Ed.2d 964 (1995) (noting a "policy of avoiding unnecessary adjudication of constitutional issues"); *Ashwander v. Tennessee Valley Auth.*, 297 U.S. 288, 347, 56 S.Ct. 466, 80 L.Ed. 688 (1936) (Brandeis, J., concurring) ("The Court will not pass upon a constitutional question although properly presented by the record, if there is also present some other ground upon which the case may be disposed of."). *See also Bowman v. Ten-*

### B. *Plaintiffs Will Be Irreparably Injured Absent Preliminary Relief*

■ It is well settled that "the loss of First Amendment freedoms, for even minimal periods of time unquestionably constitutes irreparable injury." *Elrod v. Burns,* 427 U.S. 347, 373, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976). This same presumption of irreparable harm has been applied in cases of violations of the Equal Access Act because it protects "expressive liberties." *Hsu,* 85 F.3d at 872 (holding the denial for one year of an after-school Bible group constituted "irreparable injury"); *Colin,* 83 F.Supp.2d at 1149–50 (plaintiffs who wanted to form a GSA were irreparably injured by "the inability to effectively address the hardships they encounter at school every day").

■ This same sound reasoning applies in this case. Absent a preliminary injunction, Plaintiffs will be unable to meet at school, unable to benefit from a forum for discussion with other students who are suffering the effects of harassment based on sexual orientation, and unable to work with other students to foster tolerance among all students. In this case, Plaintiffs have already been prevented from meeting for more than three months of the Spring 2003 semester. Because two Plaintiffs (Fannin and McClelland) are seniors and three Plaintiffs (Alcorn, Carter, and Duarte) are juniors, by the time this matter is resolved on the merits, these five Plaintiffs may have graduated and would therefore receive no benefit.

### C. *An Injunction Will Not Harm Defendants or Others*

The balance of the hardships also favors Plaintiffs. Compliance with an injunction will not require much effort or expense, nor will allowing the GSA Club to meet harm others. In fact, most students at BCHS are likely to benefit from a preliminary injunction because all other noncurriculum-related student activities are likely to be reinstated when the GSA Club is reinstated. This would include one or more religion or community-service based clubs.

Allowing the GSA Club to meet is unlikely to cause substantial disruption to the educational process. While the GSA Club meetings at BCHS last semester may have caused community controversy, there was no evidence that the meetings themselves caused disruptions.

### D. *An Injunction Will Serve the Public Interest*

Just as constitutional violations—and by extension Equal Access Act violations—constitute irreparable harm, the exoneration of any such violations would serve to satisfy the public interest requirement. The Sixth Circuit has consistently held that "[i]t is always in the public interest to prevent the violation of a party's constitutional rights." *See G & V Lounge, Inc. v. Michigan Liquor Control Com'n,* 23 F.3d 1071, 1079 (6th Cir.1994); *Dayton Area Visually Impaired Persons, Inc. v. Fisher,* 70 F.3d 1474, 1490 (6th Cir.1995).

Additionally, while the primary teachers of tolerance should always be the parents and not the teachers and school administrators, school officials can play a vital role in fostering tolerance to its students. If, by permitting the GSA Club to meet, students are less likely to be the subject of hate crimes by fostering tolerance in the school community, the public interest is served. *See Colin,* 83 F.Supp.2d at 1150–51 (providing a safe and respectful environment for students to talk about "the

*nessee Valley Auth.,* 744 F.2d 1207, 1211 (6th Cir.1984) ("If we are able to decide this appeal on non-constitutional grounds we will do so and will not reach the First and Fifth Amendment issues.").

hardships they encounter at school every day" serves the public interest).

## IV. CONCLUSION

Balancing the four factors set forth *Plymouth Whalers Hockey Club*, the Court concludes that each of the four factors favors the issuance of a preliminary injunction in this case. Accordingly, **IT IS ORDERED THAT**:

(1) Plaintiffs' motion for a Preliminary Injunction (Doc. # 3) be, and it is, hereby **GRANTED**;

(2) Defendants must give the GSA Club and its members equal access to those activities of student groups permitted at BCHS and not directly related to the curriculum, including the opportunity to meet before school (as the Bible Club has done), after school (as the drama group has done), and during home room (as many other student groups have done); to submit announcements about schedule changes and events to be read over the loudspeaker during home room, to submit information about the GSA Club to be published in the school newspaper, and to post information about GSA Club meetings and activities on the appropriate school bulletin boards;

(3) because there is little, if any, risk of monetary loss to Defendants by granting the injunction, and Plaintiffs have shown a strong likelihood of success on their Equal Access Act claim, the Court **WAIVES** the security require-

ment set forth in Rule 65(c), Federal Rules of Civil Procedure; [17]

(4) Defendants shall file their **answer** to the complaint **within twenty (20) days** from the date of entry of this Order; and,

(5) this matter is scheduled for a **Rule 16 conference on May 21, 2003, at 11:30 a.m. at Ashland**, Kentucky, at which time the Court will discuss the proposed case schedule. In that regard, the parties are directed to file their **Rule 26 Report of Planning Meeting** not later than **May 16, 2003**.

---

**17.** While a district court must consider whether security is appropriate, the court need not actually require security—instead, the decision is left to the sound discretion of the court. *See Moltan Co. v. Eagle–Picher Indus., Inc.*, 55 F.3d 1171, 1176 (6th Cir. 1995) ("While we recognize that the language of Rule 65(c) appears to be mandatory, and that many circuits have so interpreted it, the

rule in our circuit has long been that the district court possesses discretion over whether to require the posting of security.").